[L. A. No. 3360.   In Bank.—April 5, 1915.]

## C. W. HARRISON, Doing Business as The Harrison Machine Works, Respondent, v. R. M. ARMOUR and R. W. KEMP, Defendants and Appellants; G. H. BANCROFT et al, Defendants.

CORPORATION—STOCK ISSUED WITHOUT BEING FULLY PAID—LIABILITY OF STOCKHOLDERS TO CREDITORS.—Where the stock of a corporation is issued without being fully paid up, the amount remaining unpaid is, so far as its creditors are concerned, deemed to be money due to the corporation from its stockholders, and resort to such fund may be had by such creditors.

ID.—LIABILITY WHEN STOCK IS SOLD FOR MONEY OR PROPERTY—FICTITIOUS VALUATION—CONSTRUCTIVE FRAUD.—Where the stock was sold for money and the purchase price was less than the par value of the stock, the difference between the par value and the amount actually paid is the measure of the stockholder's liability.  In cases, however, where the stock is not sold for cash, but is issued in return for real or personal property having no defined value, the rule is that where the corporation and stockholder have agreed upon a given valuation for the property transferred, such valuation is binding and conclusive unless it is fraudulent in purpose or effect. But if the parties have put upon the property a valuation in excess of what they knew or believed to be its true value, this is a constructive fraud upon the creditors and the stock will be deemed paid only to the extent of the actual value of the property received in exchange for it.

ID.—EXCHANGE OF STOCK FOR PATENT RIGHTS—UNASCERTAINED VALUE—PRESUMPTION THAT STOCK WAS ISSUED AS FULLY PAID.—Where certain patent rights, of unascertained value, are turned over to a corporation in exchange for a specified number of shares of its stock, the natural and ordinary interpretation of the transaction is that the property is taken in payment of the given number of shares, and, in the absence of anything showing the fixing of a smaller valuation upon the property, it must be deemed to be transferred and taken as payment of the par value of the shares.  It is immaterial that neither the corporate resolution authorizing the exchange, nor the contract of exchange itself, nor the certificates for the stock, described the stock as fully paid.

ID.—SALES OF STOCK FOR CASH AT LESS THAN PAR.—The fact that cash sales of the stock were made at less than par is not proof that the issue of the stock in exchange for the patent rights was intended to be or was at the same rate.

APPEAL from a judgment of the Superior Court of Los Angeles County. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

James P. Clark, C. A. Post, and H. S. Clewett, for Appellants.

J. B. McLaughlin, for Respondent.

SLOSS, J.—This is an action by a judgment creditor of a corporation, to subject to the payment of his claim the unpaid subscriptions of various stockholders.

The complaint alleged the incorporation, in June, 1907, of Marine Power and Electric Company, the recovery by the plaintiff on July 7, 1911, of a judgment against said corporation for $1,127.35 and costs, the return of the execution unsatisfied and the nonpayment of the judgment. It alleged further that the capital stock of the corporation was divided into shares of the par value of one dollar each and that the various defendants had subscribed for and were the owners of certain numbers of shares for which no more than twenty-five cents per share had been paid, the balance of seventy-five cents per share being still unpaid and subject to the payment of plaintiff's judgment. Of the various defendants, R. M. Armour was alleged to be the owner of eleven thousand shares and R. W. Kemp of six thousand shares. The judgment went in favor of the plaintiff against all the defendants. Armour and Kemp appeal from the judgment. As they are the only appellants, the situation of the other defendants need not engage our further attention.

The two appellants answered jointly. They denied, among other things, that any sum remained unpaid on account of their stock. The court found in favor of the plaintiff on all the issues, the finding on the immediate point just referred to being that Armour was the owner of eleven thousand shares of stock, for which no more than twenty-five cents per share had been paid, and upon which there was unpaid and subject to the payment of the corporate debts and of plaintiff's judgment the sum of eight thousand two hundred and fifty dollars. With respect to Kemp the finding is similar except that the number of shares owned by him was

six thousand shares and the balance of the subscription price found to be unpaid was four thousand five hundred dollars. These findings, so far as they relate to the amount paid in on the stock, are attacked as unsustained by the evidence. We think the objection is well founded.

The Marine Power and Electric Company was organized in June, 1907, with a nominal capital stock of one million dollars, divided into one million shares of the par value of one dollar each. Some two months theretofore a corporation known as the Bancroft-Compton Realty Company had been organized. The last named corporation had secured from the government of the United States and other governments patents for a device to utilize the power of ocean waves. On June 8, 1907, its directors, at a meeeting regularly held, adopted a resolution that the Bancroft-Compton Realty Company enter into negotiations with the Marine Power and Electric Company "whereby they receive sixty thousand shares of the Marine Power and Electric Company's stock, in payment for the sole rights to use the said Bancroft-Compton Realty Company's wave motor in the five counties, viz., Los Angeles, Orange, San Diego, San Bernardino and Riverside, and furthermore that they receive five per cent of the gross income of all plants erected by the said Marine Power and Electric Company within the five above-named counties." This proposal was made to the directors of the Marine Power and Electric Company, and was by them accepted. Pursuant thereto a written contract between the two corporations was executed on July 10, 1907. This agreement provides that Bancroft-Compton Realty Company "in consideration of the transfer to it of sixty thousand shares of the capital stock of the said Marine Power and Electric Company, and in consideration of the said Marine Power and Electric Company agreeing with the said Bancroft-Compton Realty Company to pay to the said Bancroft-Compton Realty Company five per cent of the gross income of any plant or plants that may be erected under the said patents by the said Marine Power and Electric Company" agrees to assign, sell and transfer to the Marine Power and Electric Company the exclusive right to use the said patents in the five counties above mentioned.

Pursuant to this contract certificates for sixty thousand shares were issued to the Bancroft-Compton Realty Company and that corporation divided up these shares among its own

stockholders in certain proportions. It was under this distribution that Armour received his eleven thousand shares and Kemp the six thousand owned by him. No evidence whatever was offered to show the value of the rights thus transferred in return for the sixty thousand shares of stock. It appeared, however, that at a meeting held on the eighth day of June, 1907, the board of directors of the Marine Power and Electric Company had adopted a resolution providing that a block of one hundred thousand shares of the company's stock be offered for sale at twenty-five cents per share "or increased in price at any time by direction of the board of directors" for the purpose of erecting a commercial plant. This was two days prior to the meeting at which the offer of the Bancroft-Compton Realty Company was accepted by the directors of the Marine Power and Electric Company. Pursuant to this authorization a number of sales of stock at twenty-five cents per share in cash were made to various persons.

It is thoroughly settled in this state and in other jurisdictions that "where the stock of a corporation is issued without being fully paid up, the amount remaining unpaid is, so far as its creditors are concerned, deemed to be money due to the corporation from its stockholders," and resort to such fund may be had by such creditors. (*Herron Co.* v. *Shaw,* 165 Cal. 668, [Ann. Cas. 1915A, 1261, 133 Pac. 488].) The doctrine has been applied in two classes of cases. Where the stock was sold for money and the purchase price was less than the par value of the stock, the difference between the par value and the amount actually paid is the measure of the stockholder's liability. A typical instance of this kind was presented in the leading case of *Vermont Marble Co.* v. *Declez Granite Co.,* 135 Cal. 579, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057], where twenty dollars per share, in cash, had been paid on shares of the par value of one hundred dollars. There are, however, many cases in which the stock is not sold for cash, but is issued in return for real or personal property having no defined value. In such cases the rule is that where the corporation and stockholder have agreed upon a given valuation for the property transferred, such valuation is binding and conclusive unless it is fraudulent in purpose or effect. But if the parties have put upon the property a valuation in excess of what they knew or be-

lieved to be its true value, this is a constructive fraud upon the creditors and the stock will be deemed paid only to the extent of the actual value of the property received in exchange for it. (*Herron Co.* v. *Shaw*, 165 Cal. 668, [Ann. Cas. 1915A, 1261, 133 Pac. 488].) In this case we think the plaintiff and the court below fell into error in confusing these two classes of cases. There was no attempt to show that the patent rights transferred to the corporation were over-valued, knowingly or otherwise. So far as appears they may, at the time of the transaction, have been worth sixty thousand dollars, the amount of the par value of the stock issued in exchange for them, or more. The theory of the court below seems to have been, not that property worth less than sixty thousand dollars was taken at sixty thousand dollars, but that the property, i. e., the patent rights, were turned into the corporation as a twenty-five per cent payment on account of the stock, the respective boards of directors agreeing expressly, or impliedly, that said rights should be taken at a valuation of fifteen thousand dollars, or twenty-five per cent of the par value of the stock issued in exchange for them. We see nothing in the record to justify this view. The transaction between the two corporations was one whereby certain property of unascertained value was turned over to the Marine Power and Electric Company in exchange for sixty thousand shares of its stock. The natural and ordinary interpretation of such a transaction is that the property is taken in payment for the given number of shares, and, in the absence of anything showing the fixing of a smaller valuation upon the property, it must be deemed to be transferred and taken as payment of the par value of the shares. In other words, the two corporations plainly intended to issue the stock as fully paid. It is true that neither the resolutions adopted by the respective boards of directors, nor the contract itself, contained the term ''fully paid stock.'' But this is unimportant, there being nothing to show that there was any attempt to fix a valuation which would make it less than fully paid.

Nor do we attach any significance to the fact that the certificates of stock did not describe the shares as fully paid. It is a very common practice to issue certificates containing nothing to show whether the stock is fully or part paid. No inference against full payment is to be drawn from the silence

of the certificate. On the contrary, where the case involved the rights of purchasers from the original subscribers, it has been held that the presumption arising from a certificate in this form, if there be any presumption, is that the stock is fully paid for. (1 Cook on Corporations, 6th ed., sec. 50; *Johnson v. Lullman,* 15 Mo. App. 55.)

The circumstance upon which the respondent places his main reliance is that, prior to the agreement for the issuance of the sixty thousand shares, the directors of the Marine Power and Electric Company had authorized the sale of one hundred thousand shares at twenty-five cents per share. But the sixty thousand shares issued in return for the patent rights were no part of the stock thus authorized to be sold. The sale of the one hundred thousand shares was to be made for the purpose of erecting a plant, and the resolution authorizing it evidently contemplated sales for cash. The fact that cash sales were made at twenty-five cents per share is no proof that an issue of stock in exchange for patent rights was intended to be or was at the same rate. The two transactions are essentially different, and the nature of each must be determined from its own facts.

Under the allegations of the complaint it would have been open to the plaintiff to prove that the patent rights, although turned in at a valuation of sixty thousand dollars, were and were known or believed by the parties to be, worth much less. (*Herron Co.* v. *Shaw,* 165 Cal. 668, [Ann. Cas. 1915A, 1261, 133 Pac. 488].) But no such proof was offered. In its absence there is no adequate support for the finding that only twenty-five cents per share had been paid on the stock held by appellants.

The judgment is reversed and the cause remanded for a new trial.

Shaw, J., Melvin, J., Lorigan, J., Henshaw, J., and Angellotti, C. J., concurred.