[L. A. No. 4828.  Department Two.—May 14, 1919.]

## MRS. C. N. HASSON, Appellant, v. J. E. KOEBERLE et al., Respondents.

[1] CORPORATIONS—DONATION OF STOCK TO CORPORATION—COLLATERAL ATTACK BY PURCHASER—RIGHT OF CREDITOR.—Where a corporation issues all of its capital stock and thereafter a donation back to the corporation is made of certain shares by those stockholders whose shares were issued to them for property, purchasers of a part of such returned stock cannot contend as against a creditor of the corporation that the stock issued to them was an overissue of treasury stock.

[2] ID.—SALE OF STOCK FOR MONEY—PURCHASE PRICE LESS THAN PAR VALUE—MEASURE OF STOCKHOLDER'S LIABILITY TO CREDITORS.— Where stock is sold for money and the purchase price is less than the par value of the stock, the difference between the par value and the amount actually paid is the measure of the stockholder's liability to creditors, as to unpaid subscriptions.

[3] Id.—Issuance of Stock for Property of Uncertain Value— Fictitious Valuation — Constructive Fraud on Creditors. — Where the stock is not sold for cash but is issued for real or personal property having no generally defined value, the rule is that where the corporation and stockholder have agreed upon a given valuation for the property transferred, such valuation is binding and conclusive unless it is fraudulent in purpose or effect. But if the parties have put upon the property a valuation in excess of what they knew or believed to be its true value, this is a constructive fraud upon the creditors and the stock will be deemed paid only to the extent of the actual value of the property received in exchange for it..

[4] Id.—Applicability of Rule to Mining Corporations — South Mountain Mining Company Case Overruled.—The rule enunciated in *Herron* v. *Shaw,* 165 Cal. 668, and *Harrison* v. *Armour,* 169 Cal. 787, that stockholders of a corporation are liable to creditors for the difference between the value of property exchanged for stock and the par value of the stock, is a general rule applicable to all classes of corporations, and the rule stated *In re South Mountain Consolidated Min. Co.,* 7 Sawy. 30, excepting its application in the cases of certain classes of mining corporations, no longer properly expresses the law in force in this state.

[5] Id.—Action on Stockholder's Liability—Mining Corporation— Belief of Corporators as to Value of Property Received for Stock—Evidence.—In an action by a judgment creditor of a mining corporation to recover of certain stockholders who had purchased shares of stock from the corporation which had been donated back to it by certain stockholders, evidence should have been received at the trial bearing on the belief of the corporators as to the value of the property, to the end that it might have been determined what that belief was, and whether it was in fact honest and intelligent.

[6] Id.—Actual Value of Property—Proper Standard.—In such action, a finding of value of the property at the time of the transfer to the corporation based upon prospective earning power as determined at a time subsequent to the transfer, is not the proper standard, since it was the duty of the court to determine the value by ascertaining as nearly as possible what a reasonably prudent investor who contemplated spending his own money would have been willing to pay for the property under the circumstances under which the corporators acted on the date of the transfer.

APPEAL from a judgment of the Superior Court of Los Angeles County. Pat R. Parker, Judge Presiding. Reversed.

The facts are stated in the opinion of the court.

Samuel H. Pardue for Appellant.

Jones & Evans and Mattison B. Jones for Respondents.

LENNON, J.—On March 7, 1907, the Ord Mountain Gold Company was an Arizona corporation, with a capital stock of one million shares of the par value of one dollar each. On that date, the directors held a meeting for the purpose of organization and issued four hundred and fifty thousand shares each to T. N. Hasson and George L. Hasson, respectively, and the remaining one hundred thousand to one Steadman. Thereupon, the Hassons each undertook to donate back to the corporation two hundred and fifty thousand shares by means of the cancellation of the original certificates and the issuance of new certificates for the lesser number of shares then remaining to each donor. The original issue to the Hassons was made in consideration of the transfer of certain mining properties to the corporation. On March 15, 1907, the corporation issued to the defendant Gossman five thousand shares of stock, for which he paid $250. On March 11 and on April 30, 1907, issues totaling four thousand shares were made to the defendant Koeberle for the sum of two hundred dollars.

In 1914, the plaintiff obtained a judgment against the company for $7,518.92, and, the corporation being insolvent, execution thereon failed and the judgment remained unsatisfied. In January, 1915, the plaintiff brought separate actions against the defendants Gossman and Koeberle as shareholders in the corporation contending: (1) That the stock was issued to the Hassons for property taken at a gross overvaluation; (2) that by an application of the rule of *Herron* v. *Shaw*, 165 Cal. 668, [Ann. Cas. 1915A, 1265, 133 Pac. 488], the Hassons were liable to creditors of the corporation for the difference between the value of the property and the par value of the stock, and (3) that by an application of the rule of *Perkins* v. *Cowles*, 157 Cal. 625, [137 Am. St. Rep. 158, 30 L. R. A. (N. S.) 283, 108 Pac. 711], the defendants, even if they are *bona fide* transferees for value, are liable to the plaintiff for the said difference as prorated upon their part

of such stock which was subsequently issued to them after being returned to the corporation by the Hassons.

The actions were tried together and from a single judgment in favor of both defendants the plaintiff brings this appeal. The theories advanced by the respondents resolve themselves into two main contentions: (1) That the Hassons did not in fact succeed in returning any stock to the corporation, wherefore the issue to the defendants was an overissue of treasury stock, and, as such, an *ultra vires* issue against which the rule of *Herron* v. *Shaw, supra,* should not apply, and (2) that the rule of *Herron* v. *Shaw, supra,* should not apply against issues of stock by corporations organized solely to develop and operate mining properties where all, or practically all, of the stock is issued in return for undeveloped claims of a real but necessarily of an unknown and speculative value. One argument of the respondents in support of this contention is that it is a matter of such common knowledge that there is no relation between the par value of mining stock and the assets of the corporation that creditors could not be supposed to rely upon any representation that the corporation had received assets up to the par value of the stock.

[1] Considering respondents' first contention, we note the following facts: The Hassons intended to donate and the corporation intended to receive five hundred thousand shares of the stock. It was noted in the minutes of the corporation that the stock had been donated. The corporation has at no time undertaken to issue certificates representing more than the authorized capital stock. The certificates originally issued to the Hassons, each representing four hundred and fifty thousand shares of stock, were canceled and certificates were delivered to the Hassons, each purporting to represent but two hundred thousand shares of the stock. This transaction effectively placed five hundred thousand shares of stock under the control of the corporation. However technically imperfect the form of the donation may have been, the facts show that it was effected, and it must clearly be held valid against any collateral attack. Independently of any question of the effect of an *ultra vires* issue, it therefore appears that the respondents' first contention is without merit.

Turning now to the second contention, we find the law well settled. It should be noted that although the Ord Mountain Gold Company is a corporation organized under the laws of

Arizona and doing business in California, it is to the California law that the parties have appealed in their briefs and arguments. **[2]** Looking, therefore, to the California law, we find it undisputed that where stock is sold for money and the purchase price is less than the par value of the stock, the difference between the par value and the amount actually paid is the measure of the stockholder's liability to creditors and that **[3]** in cases where the stock is not sold for cash, but is issued for real or personal property having no generally defined value "the rule is that where the corporation and stockholder have agreed upon a given valuation for the property transferred, such valuation is binding and conclusive unless it is fraudulent in purpose or effect. But if the parties have put upon the property a valuation in excess of what they knew or believed to be its true value, this is a constructive fraud upon the creditors and the stock will be deemed paid only to the extent of the actual value of the property received in exchange for it." (*Harrison* v. *Armour,* 169 Cal. 787, [147 Pac. 1166]; *Herron* v. *Shaw, supra; Vermont Marble Co.* v. *Declez,* 135 Cal. 579, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1057].)

Cases supporting this rule decided in this jurisdiction and elsewhere were reviewed and commented upon in *Lucey Co.* v. *McMullen,* 178 Cal. 425, [173 Pac. 1000], and in *Sherman* v. *Harley,* 178 Cal. 584, [174 Pac. 901]. These cases do not intimate that the rule is not general in its application or that it is subject to an exception in favor of any given class of corporations. In 1881, however, the case of *In re South Mountain Consolidated Min. Co.* (7 Sawy. 30, [5 Fed. 403]), was decided in the United States district court for the district of California. In that case the court stated the question before it as follows: "Does the acceptance of stock in a mining corporation, as they are usually formed in this state, create any obligation, either under contract or by law, to pay to the corporation or to its creditors the nominal par value of the stock so accepted?" This question was answered in the negative, the court deciding that a creditor of a mining corporation is left to the statutory liability of the stockholder for his *pro rata* of the corporate debts. The decision was wholly based upon an asserted difference between mining corporations, as organized in California, and other kinds of corporations. The court recited the custom of giving mining stock a purely arbi-

trary value, which "neither bears nor is intended nor supposed by the public to bear the slightest relation to the real value of the property—a value nearly always conjectural, and very often imaginary." On a review of the case in the circuit court of the United States (8 Sawy. 366, [14 Fed. 347]), this view was upheld, the court saying: "Mining corporations in California are, in these particulars, *sui generis*. They are organized and carried on upon principles, in these respects wholly different from banking, railroad, insurance, and like commercial corporations having a *subscribed* capital stock. There is no agreement express or implied, to pay any particular amount of stock, and no one understands that there is. Certainly none is intended by the parties."

While in the present case the record does clearly show that the Ord Mountain Gold Company was solely a mining company, the facts as revealed in the pleadings, proof, and findings do not indicate that its capital stock was not subscribed or that there was no agreement, express or implied, to pay any particular amount of stock or that none was intended by the parties. The organization, so far as appears from anything in the record, differed in no material respect from that of an ordinary business corporation.

But aside from these considerations, an examination of the California cases from the year 1882 to the present reveals the fact that while the South Mountain case has been repeatedly cited by the profession as an authority, this court has, in each instance, refused to do more than give it tentative recognition, and certainly has never approved the doctrine enunciated therein. (See, for example, *Harmon* v. *Page,* 62 Cal. 448; *Vermont Marble Co.* v. *Declez,* 135 Cal. 579, [87 Am. St. Rep. 143, 56 L. R. A. 728, 67 Pac. 1067]; *Herron* v. *Shaw,* 165 Cal. 668, [Ann. Cas. 1915A, 1265, 133 Pac. 488].)

We are aware of no sound principle upon which the decision in the South Mountain case can be upheld at the present day. The reasons forming the basis for the general rule stated in *Herron* v. *Shaw* and *Harrison* v. *Armour, supra,* apply as well to mining corporations as to corporations formed for other purposes. Nor do we see any reason why it would work any peculiar hardship upon a mining company, as distinguished from any other kind of corporation, to be required to take property in exchange for stock at what the corporators honestly and intelligently believe to be its actual

value. If it is true that there is a custom to fix mining shares at a purely arbitrary par value having no relation to the value of the assets taken therefor, that fact cannot alter the rule of law requiring that there be such a relation. The precise question was raised in *See* v. *Heppenheimer,* 69 N. J. Eq. 36, [61 Atl. 843], where it was urged upon the court that it was a matter of common knowledge that stock was issued by New Jersey corporations for property taken at a gross overvaluation. Pitney, V. C., admitted that the practice had been so frequently indulged in that it had brought obloquy upon the state, but asserted that whenever it had been indulged in it had involved a clear infringement of, if not a fraud upon, the letter and spirit of the laws of the state. If, therefore, it is customary for mining corporations in this state to issue stock for property which has no relation to the par value of the stock so issued, we can likewise only express our regret and point out that it has in every case involved a clear infringement of our laws.

[4] It follows that the rule enunciated in *Herron* v. *Shaw* and *Harrison* v. *Armour, supra,* is a general rule applicable to all classes of corporations, and that the rule stated in *In re South Mountain Consolidated Min. Co., supra,* no longer properly expresses the law in force in this state. Consequently, unless the corporators knew or believed that the Ord Mountain mining claims were worth one million dollars, the stock is to be deemed paid only to the extent of the actual value of those claims at the time of the transfer to the corporation. We are also of the opinion upon a review of the cases that, however morally righteous was the belief of the corporators, if it was reached without intelligent examination into the elements of value, or by including items not really "property," or by the influence of self-interest, the issue would be as much a violation of the statutory and constitutional provisions as though it had been dictated by corrupt motives. (*See* v. *Heppenheimer, supra; Donald* v. *American Smelting Co.,* 62 N. J. Eq. 729, [48 Atl. 771, 1116]; *Holcombe* v. *Trenton White City Co.,* 80 N. J. Eq. 122, [82 Atl. 618]; *Gillett* v. *Chicago Co.,* 230 Ill. 373, [82 N. E. 891].) It may be remarked at this point that in determining whether or not the corporators did in fact honestly and intelligently believe the Ord Mountain claims to be worth one million dollars the circumstances attending and following the transfer should be

taken into consideration. Immediately following the transfer, shares of the par value of one dollar each and of the total par value of five hundred thousand dollars were returned to the corporation. A short time thereafter several thousand of these shares were sold to the respondents at five cents a share. These circumstances cast grave suspicion, to say the least, upon the existence of any honest and intelligent belief that the Ord Mountain claims were worth one million dollars.

[5] It follows from the foregoing discussion that evidence should have been received at the trial bearing on the belief of the corporators as to the value of the property, to the end that it might have been determined what that belief was, and whether it was in fact honest and intelligent. The court, however, acting on the theory that the opinion of the corporators was wholly immaterial, confined the issue to the actual value of the property at the time of the transfer to the corporation. The finding of the court on this point is as follows: ''That at said time said mining claims had a value subsequently determined of yielding dividends on an investment of one million dollars; that said one million shares fully paid were not disproportionate in value to the said mining claims, and that the consideration for the issuance of said stock, fully paid up, was reasonable, just and adequate.''

The finding in effect rests upon the conclusion that the property was worth one million dollars, because it would pay dividends on one million dollars. It is not, however, found that the dividends referred to would be a reasonable or adequate return on an investment of one million dollars. Moreover, it is evident that future earning capacity rather than present cash value was adopted as a standard. We do not mean to say that prospective earning capacity, properly subordinated to other modes of ascertaining value, may not be considered in determining present cash value. We are compelled to conclude, however, that the court adopted a prospective earning power as the standard of value, and did not consider it as merely some evidence of present cash value which upon a review of the cases we take to be the standard approved by them. It was the duty of the court to determine this value by ascertaining as nearly as possible what a reasonably prudent investor who contemplated spending his own money would have been willing to pay for the Ord Moun-

tain claims under the circumstances under which the cor-
porators acted on the date of the transfer.

That the finding in question was not based upon the ap-
plication of such a standard may be demonstrated by a review
of the evidence.    Dr. Koebig, the plaintiff's mining expert,
was asked on the cross-examination: "It might be reasonable
to expect, Dr. Koebig, that that profit would run into millions,
just as much as into thousands?"    The doctor answered:
"Well, I am not so used to figure by the millions, but cer-
tainly this property, in my judgment, was a property that
could pay dividends on a very large sum of money—if you
please, a million—and good dividends on such, if the indica-
tions are borne out by the future development, and my opin-
ion was there will be."    This opinion was based upon an ex-
amination made after one hundred and fifty thousand dollars
had been spent in developing the mine.    On the other hand,
the same witness at another time in the trial stated that he
could best give an idea of his opinion of the value of the mine
by recounting a conversation which he had had with Mr.
Hasson.    It appeared that at a time after the expenditure of
the one hundred and fifty thousand dollars before referred to,
Hasson asked Koebig whether it would be wise to accept two
hundred and fifty thousand dollars for the property.    Koebig
answered that that would be getting a "very good value" for
the property.    Samuel J. Paul, another mining expert called
for the plaintiff, testified that at the time of the transfer of
the property to the corporation he would have considered it
worth between twenty-five thousand dollars and  thirty-five
thousand dollars.    This was the only testimony as to the value
of the claims.

[6]    It is clear from this analysis of the evidence that the
finding of the court is based upon prospective earning power
as determined at a time subsequent to the transfer.    The judg-
ment cannot, therefore, be sustained on the theory that the
evidence shows that the actual cash value of the property
in the sense in which we have defined that term was one mil-
lion dollars at the date of the transfer in question.

The judgment appealed from is reversed and the case
remanded for a new trial.

Wilbur, J., and Melvin, J., concurred.