[File No. 5868.]

**L. E. SHORES, Appellant, v. DAKOTA-MONTANA OIL CO., a Corporation, Respondent.**

(74 A.L.R. 1370, 237 N. W. 172.)

Opinion filed March 14, 1931. Rehearing denied June 15, 1931.

*Nestos, Herigstad & Stenersen* and *Louis P. Donovan,* for appellant.

*P. M. Clark, George A. McGee,* and *T. H. Breaw,* for respondent.

BURR, J.  The controversy involved herein was before us upon a demurrer to the complaint.

In the briefs and on the argument upon the demurrer defendant specifically challenged the complaint on the ground that it did not show any contract or agreement with the corporation, nor any action by the Board of Directors binding the corporation, nor any fraud on the part of the corporation itself; that on the contrary the complaint showed that any contract or agreement made by the plaintiff concerning his shares of stock were made with certain individuals who at the time happened to be officers of the corporation and the majority of the directorate.  We were therefore required to pass upon the language of the complaint.  We held that the allegation in the complaint to-wit: "that on or about said date, the said named officials of said corporation in its behalf and for it, stated and represented to the plaintiff" certain matters, together with other allegations, such as paragraph three of the complaint, to wit:  "That on March 17, 1923, and prior thereto, and immediately succeeding said date, the said officials and managing officers of said corporation were respectively:  M. E. Porter, Secretary and Treasurer, A. M. Fruh, Vice-President and F. C. Kaatz, President. That said managing officials constituted a majority of the directorate of said corporation and on said date and prior thereto, and for a long period thereafter exercised the entire management and control of said corporation, directed and conducted its business and continued so to do for more than a year after March 17, 1923," were allegations of the action of the corporation itself, and sufficient to constitute a cause of action against the corporation.  Accordingly we sustained the lower court in its order overruling the demurrer.  See opinion reported in 57 N. D. 926, 224 N. W. 901.

The defendant answered denying any contract or agreement with plaintiff and specifically alleged:

"That on or about the 16th day of April, 1920, the plaintiff herein and the said A. M. Fruh and M. E. Porter issued to themselves 200,000 shares of the capital stock of the defendant corporation, all of which said shares of stock were issued by the said directors to themselves without any consideration whatsoever being paid for same, and the

defendant did not actually receive for said shares of stock any money, labor or property estimated at a money value of $200,000, or at any value whatsoever, and defendant *alleges* That all of the said stock was illegally and fraudulently issued by the said directors above named to themselves, and that all of the said directors were interested in the issuance of said stock adversely to the defendant corporation, and all of said directors, including plaintiff herein, participated in said illegal issuance of said stock to themselves, and that all of the said stock so issued was illegal, fictitious and void."

However when we consider the evidence, and interpret the complaint in the light thereof, we find plaintiff's claim to be, that 200,000 shares of stock out of an authorized issue of 500,000 shares at the par value of $1.00 per share were issued to the Northwest Oil Gas Company— a partnership consisting of the plaintiff and Messrs. Fruh, and Porter —in exchange for oil and gas leases to 25,000 acres of land in the vicinity of Mohall, this state; that plaintiff had a one-third interest in this issue, but voluntarily reduced his interest to 18,000 shares; that these three were the only stockholders at that time; that thereafter Kaatz received 25,000 shares in payment of what was known as the Wilcox lease on oil and gas lands in Montana; that Porter represented to plaintiff that if plaintiff would further reduce his holdings by the surrender of 8,500 shares he, and Fruh and Kaatz would reduce their holdings to less than 18,000 shares each; that this stock so surrendered was to be turned into the corporation and sold by the corporation to outside parties for par value, and thus the corporation and these individuals would be enriched; that Messrs. Kaatz, Fruh and Porter were the President, Vice President and Secretary-Treasurer of the corporation respectively, and constituted a majority of the directorate; that he relied upon the representations made by Porter for himself and for Fruh and Kaatz and surrendered his stock; that Messrs. Kaatz, Fruh and Porter failed and refused to cut down their holdings; that when the plaintiff learned of their refusal he demanded from the corporation the return of his stock and upon the refusal of the corporation to issue to him 8,075 shares, the number of shares he surrendered, he brought this action, in conversion against the corporation to compel return of the shares surrendered or for their value.

The case was tried to a jury who returned a verdict in favor of the

plaintiff for over $11,000 principal and interest, and upon order of the court judgment was entered in accordance with the verdict.

Both plaintiff and defendant made motions for judgment notwithstanding the verdict. Both motions were overruled and both sides appeal.

The defendant claims that there is no evidence whatsoever of any contract or agreement with the corporation; that on the contrary the evidence shows conclusively that whatever agreement was made by the plaintiff whereby he surrendered stock to the company, was made with Messrs. Fruh, Porter and Kaatz, who at that time were officials of the corporation, and a majority of the directorate; that there was no action of the corporation upon said contract, no ratification thereof; no action taken by the board of directors authorizing it or confirming it; and that if the plaintiff is in any way damaged his right of action is against those who made the agreement with him to surrender stock and breached the agreement; that the undisputed evidence shows that this stock held by the plaintiff was issued to him without any consideration whatsoever; and that in any event the evidence shows Messrs. Fruh, Porter and Kaatz did not in fact hold more stock than the amount alleged to have been agreed upon.

On the other hand plaintiff, in his motion for judgment notwithstanding the verdict, claims he has proved the allegations of his complaint; that he surrendered 8075 shares of stock; that the undisputed evidence shows the stock was worth $5.00 per share at the time he returned it and the verdict of the jury should have been for $40,375.00 with interest. Plaintiff dealt with Porter only. He does not claim to have had any agreement with Fruh and Kaatz personally, or that they individually made any promise to him. He says he never talked to them about reducing their stock or they to him nor did he ever ask either of them if Porter had any authority to make an agreement for them, but that Porter said they would. Porter explicitly denies saying so and denies the agreement as set out by plaintiff, and Fruh and Kaatz deny making any agreement to cancel stock, or authorizing Porter to make any for them.

There is a total failure of proof involving Fruh or Kaatz in an agreement to surrender stock. Fruh says he never authorized Porter to make any promise for him, that he never knew anything of the

alleged agreement with the plaintiff until the time of the commencement of the action, that he never agreed to any such arrangement and the matter of his surrendering any of his stock was never mentioned to him. He does say that one time he was discussing with Porter and Kaatz some method of carrying on the work of the corporation and at that time there was some talk of getting Shores to "place some more stock back with us and help us to carry on the work with the stock" "three to one." By the expression "three to one" he meant that in the sale of stock to outside persons a purchaser who bought one hundred dollars' worth of stock at par value would be given free double the amount purchased from what was called the "slush fund," this bonus in shares coming from "the original issue to the Northwest Gas Oil Company," that is, from that part of the 200,000 issue taken by Shores, Fruh and Porter which had been voluntarily surrendered by those parties. Fruh says there was some conversation about Shores making a further relinquishment, that Porter said he would go down and see Shores, and later Porter and Shores came to the office and Porter left some stock there; but no agreement that he, Fruh would make any cancellation.

Porter says that the reason Shores cut down his holdings in the amount of stock issued to the Northwest Gas Oil Company to 18,000 shares was because he could give no more time or money to the development of the company and he gave back to the company what had been issued to him retaining only enough to pay him for the time and money he had already expended, and which he himself rated at 18,000 shares; that they told him he should cut his holdings to 10,000 shares; that later he talked with Shores and to see whether he would agree to cut his holdings to 10,000 shares and told him about the developments in Montana and the lease held by Kaatz; that they thought he was holding too many shares for what he had done; that the Kaatz lease or Wilcox lease was held by them and unless Shores cut down his holdings they would drop out of the company and put another in its place and hold the Montana leases, but if Shores and his wife would cut down their holdings to 10,000 "we would go out and finance that company and endeavor to make their stock worth something." Mr. and Mrs. Shores deny this version of the conversation.

Kaatz testifies: that he came into the company after Shores retired

as an officer and after he obtained the Wilcox lease, that he talked with Porter about Shores holding "18,000 shares for what little he had done and also stated that he was not going to assist the company any further with finance, either by money or his services;" that they agreed between themselves they would "reorganize a new company and declare all stockholders in, that had paid in any money into the new company, and get away from carrying this overhead of big heavy return of stock;" that we talked about telling Shores this and that Porter went to see Shores, and he authorized Porter to go down and talk to Shores and that it was after this that Shores made a further reduction in his holdings. Both Fruh, Porter and Kaatz, who remained as active workers for the corporation, deny any agreement to reduce their stock. Plaintiff says they were present in the office of the company when Porter and he came with the stock and that he left the stock with the officers, but he did not know which one took it. According to plaintiff Porter was the vice president when the agreement was made, but the conversations as related by the plaintiff are merely to the effect that Porter and the other would surrender stock. Nothing was said in the conversation about the corporation acting on the matter. Even taking the plaintiff's version as undisputed, and ignoring Porter's version, all it amounts to is that Porter said the others would cancel. Strange that Shores never asked the others about it. The arrangement was a private one between plaintiff and Porter.

Because Kaatz, Fruh and Porter were officers and directors does not make them, in their private dealings with each other, trustees for the plaintiff as a stockholder. They were trustees only as to the management of the corporation. Ryder v. Bamberger, 172 Cal. 791, 158 Pac. 753, 759; 5 Thomp. Corp. 3d Ed. 905. There is no evidence whatsoever showing that the directors of the corporation ever had a meeting of any kind to consider such an agreement or contract or ever authorized any such action on the part of the corporation. One stockholder makes a contract with another, claiming to represent two other stockholders, for the benefit of himself and them, and incidentally for the benefit of the corporation; these three others were the officers of the company; the corporation receives the benefit of the plaintiff's compliance with his agreement; the stock is turned into the corporation to be sold to

outside parties, the others fail to comply with the agreement and plaintiff demands from the corporation the stock he donated to it.

The testimony shows that after this donation to the corporation the sum of one hundred to one hundred and twenty-five thousand dollars was raised by sale of stock; and evidently many sales were made, for after the donation and before the action was commenced, there were between eight hundred and eight hundred fifty stockholders. The plaintiff is in the position of one making a donation to the corporation by means of which other stockholders have been induced to invest in the stock of the company. We say *induced* because these subsequent purchasers had a right to assume no more stock was issued than what appeared on the books of the corporation to have been issued. As this surrendered stock went back into the corporation it was to all intents and purposes treasury stock and the assets of the corporation were not burdened by any issued stock other than what appeared on the books of the corporation to be issued.

Under our statute "a corporation may purchase, hold and transfer shares of its own stock from its surplus profits, or as provided in the article on assessment of stock, etc." (Comp. Laws, § 4531) and the article dealing with assessment of stock, being article 10, chapter 12 of the Civil Code, permits the corporation to purchase and hold its own stock under certain conditions and in accordance with certain procedure. Where a corporation may in good faith purchase and hold its own stock it may also accept a donation of paid up shares issued by itself. See Hasson v. Koeberle, 180 Cal. 359, 181 Pac. 387; 5 Thomp. Corp. 3d Ed. 968. Even though the alleged contract was not a contract for the purchase of stock by the corporation nevertheless in essence it is not unlike a purchase and the stock thus received would be governed largely by the same rule. Much was said about the stock being cancelled. Evidently this means cancelled on the books as being owned by plaintiff. The stock lies dormant until reissued by the corporation, but the capital stock is not reduced. The stock is not retired. The alleged surrender was not for the purpose of reducing the capital stock, but for the purpose of selling it to others.

It was therefore not a merger of the stock nor a retirement of the same.

Upon purchase or donation these shares of stock become the personal property of the corporation subject to the control and disposition of the stockholders. Robinson v. Spaulding Gold & S. Min. Co. 72 Cal. 32, 13 Pac. 65. All parties agree that such shares were to be held by the corporation and then sold to outside parties at not less than par value.

It is true the agreement with Porter was for the benefit of the corporation; but because the third party received the benefit it does not mean it is necessarily burdened with the failure of one of the parties to the agreement to fulfill his agreement. The eggs could not be unscrambled. There is nothing in the record showing Shores made a contract with the corporation. It is true he claims to have made it with one who was an officer and a member of the board of directors; but the situation is no different than if he had made the agreement with a stockholder who held no official position in the corporation. Assuming Porter was acting for the others yet it was an agreement made with three other stockholders for their own mutual benefit and the benefit of the corporation. That the corporation was a beneficiary does not alter the relationship between him and the other three.

As said in Hasson v. Koeberle, 180 Cal. 359, 181 Pac. 387, supra, where stockholders intended to donate and do donate, and a new certificate is issued for "the number of shares represented by the original certificates less the number of shares donated, the transfer effectively placed shares donated under the control of the corporation, and the donation must be held valid against collateral attack." It may be said this is not a collateral attack, though it is claimed to be an action against the corporation for conversion of the stock based on an attempted rescission of a contract with the three named directors in an individual matter.

It is unnecessary therefore in this case to determine the value of the stock surrendered; or the contentions of the defendant that no fraudulent representations were made and that in any event Messrs. Kaatz, Fruh and Porter did not hold to exceed 18,000 shares of stock each. The evidence shows conclusively that there was no contract with the defendant. Defendant's motion for judgment notwithstanding the

verdict should have been granted. The judgment therefore is reversed and judgment ordered for the defendant for the dismissal of the action.

CHRISTIANSON, Ch. J., and NUESSLE, BIRDZELL, and BURKE, JJ., concur.

## On Rehearing.

BURR, J. The plaintiff made a very earnest petition for rehearing, and the court, after considering the petition granted a reargument, directed mainly to two propositions:

"First: What is there in the record to establish that there was any contract between the corporation and Shores? That is, what is there in the record to show that the agreement involved is other than an agreement regarding their interests in a company made by four persons who happen to be stockholders, and some of them officers, in the defendant corporation?

"Second: Where stockholders in a company made an agreement between themselves—primarily for their own benefit but which may incidentally be of benefit to the corporation—regarding the disposition of stock in the company held by them so that some of the stock is returned to the corporation, and it is claimed there is a breach of such agreement, may the aggrieved person recover from the corporation such benefits as the corporation incidentally received when the corpora-tion is not a party to the agreement."

Although reargued, with these two points in view, we are still of the opinion that the record clearly shows there was no contract between the plaintiff and the corporation; that the contract made was an agreement between the plaintiff and some stockholders who happened to be officials of the corporation; and if breached, was breached by these stockholders.

Without reference to the issues specifically raised by the pleadings and whether the argument now presented is in accord with the theory, the position assumed by the plaintiff is this—assuming as true the evidence most favorable to the plaintiff—the plaintiff made a contract with other stockholders for the benefit of the corporation, by the terms of which each agreed to surrender to the corporation and cancel a certain number of shares of stock. Plaintiff says he was honest in enter-

ing into this contract, intended to perform it, and did perform it; but that the other parties were dishonest in their intent, did not intend to perform, and thus by fraud induced him to surrender stock. Our statute, § 5841 says: "A contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." Had such contract been made but not performed by either party then under this statute the corporation would have had a right to enforce it against both parties to the contract at any time before the contract was rescinded; and in such an action against the parties to compel them to surrender the stock the plaintiff could not urge as a defense that he was induced to enter into the contract by fraud. Such fraud would have given him a right to rescind before the action was brought, but not having rescinded the contract before the action was brought it could be enforced as against him as well as against the other parties. In such an action it would be no defense that the other party had not yet complied. In the case at bar the plaintiff had surrendered his stock before the attempt to rescind the contract as against the other party. The corporation, under a contract made for its benefit, had received from the plaintiff just what it would have received if it had brought an action to enforce this contract for its benefit. It yet has its rights against the other parties to that contract. If, before the contract was rescinded, the third party for whose benefit the contract was made could enforce the contract and compel the plaintiff to surrender his stock it is clear the plaintiff thereafter could not have the stock returned to him even though the other parties to the contract failed to perform, and we cannot see how he can do it now simply because he complied with his contract without an action to compel him to do so.

The rescission referred to in § 5841 is rescission as against the other party to the contract. In this case the plaintiff is assuming a contract made with the corporation and seeks to rescind it on account of fraud. The theory of rescission is unavailing for there was no fraud on the part of the corporation—there being no contract with the corporation. Plaintiff claims the right to rescind; but fraud as a basis of rescission must be fraud "exercised by or with the connivance of the party as to whom he rescinds or of *any other party to the contract* jointly interested with such party;" or he may rescind "if through the fault of the

party to whom he rescinds the consideration for his obligation fails in whole or in part." Rev. Code, § 5934. Thus there can be no rescission of a contract that does not exist. Rescission of a contract with these other stockholders is another matter and we need not determine whether he can recover from them the property he gave or its value. We are of the opinion that the decision rendered is correct and therefore it is adhered to.

CHRISTIANSON, Ch. J., and NUESSLE, BURKE, and BIRDZELL, JJ., concur.