GRACE H. KELHAM, PETITIONER, ET AL.,* *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5333, 5334, 5495, 5559, 5560.
Promulgated December 20, 1949.

*Leon de Fremery, Esq.*, for the petitioners.
*W. J. McFarland, Esq.*, and *T. M. Mather, Esq.*, for the respondent.

OPINION.

TURNER, *Judge*: The respondent has determined deficiencies in
income tax against the petitioners as follows:

| Petitioner | Docket No. | 1937 | 1938 | 1939 | 1940 |
|---|---|---|---|---|---|
| Grace H. Kelham | 5333 | | | | $48,658.15 |
| Leila H. Neill | 5334 | | $2,990.24 | $242.05 | 46,762.19 |
| Ellis M. Moore | 5495 | $6,989.38 | 3,274.99 | 2,744.62 | 23,499.16 |
| Harriet H. Belcher | 5559 | | | | 1,471.00 |
| Lillie S. Wegeforth | 5560 | | 711.19 | 1,069.75 | 80,032.58 |

Overpayments are claimed as follows:

| Petitioner | 1937 | 1938 | 1939 |
|---|---|---|---|
| Leila H. Neill | | $6,703.76 | $13,975.37 |
| Ellis M. Moore | $10,436.63 | 5,723.26 | 7,324.66 |
| Lillie S. Wegeforth | | 15,578.82 | 32,427.63 |

*Proceedings of the following petitioners are consolidated herewith: Leila H. Neill;
Ellis M. Moore; Harriet H. Belcher; and Lillie S. Wegeforth.

The petitioners, during the years 1938 through 1940, were stockholders of J. D. & A. B. Spreckels Co., hereinafter referred to as the Spreckels Co. During those years Spreckels Co. made distributions to its stockholders. The respondent has determined that those distributions, in full, were taxable dividends within the meaning of section 115 of the applicable revenue acts. It is the claim of the petitioners that the distributions, in part, were distributions of capital. The facts have been stipulated.

In liquidations coming within the purview of section 112 (b) (6) of the Revenue Acts of 1936 and 1938, Spreckels Co. had acquired all of the assets of three wholly owned subsidiaries. Oceanic Steamship Co., sometimes referred to herein as Oceanic, and Monterey County Water Co. were so liquidated in 1936. The liquidation of Seventh and Hill Building Corporation occurred in 1938. Prior to March 1, 1913, and at all times since that date, Spreckels Co. and its predecessor in interest owned substantial amounts of the capital stock of Kilauea Sugar Plantation Co., sometimes referred to herein as Kilauea, and received dividends therefrom.

The parties have agreed that the extent to which the distributions made by Spreckels Co. to its stockholders during the taxable years constituted taxable dividends will be determined upon the disposition of three issues. These issues, as posed by stipulation of the parties, are as follows:

1. Whether the transfer by Oceanic Steamship Company on November 16, 1912, of 23,647 shares of its stock to J. D. Spreckels & Bros. Company in consideration for the cancellation and surrender by J. D. Spreckels & Bros. Company of notes payable by Oceanic Steamship Company to J. D. Spreckels & Bros. Company reduced the operating deficit of said Oceanic Steamship Company.

2. Whether the operating deficits of Oceanic Steamship Company and Kilauea Sugar Plantation Company as of March 1, 1913, must be restored by subsequent earnings or profits in determining the amount of earnings or profits available for dividends.

3. Whether the operating deficits of Seventh and Hill Building Corporation and Monterey County Water Company, wholly-owned subsidiaries of J. D. and A. B. Spreckels Company, were transferred to J. D. and A. B. Spreckels Company at the time of the liquidation of the said wholly-owned subsidiaries.

It is stipulated that at March 1, 1913, both Oceanic and Kilauea had operating deficits, the said deficit of Kilauea being $308,429.18, while that of Oceanic is stipulated to turn on the disposition by this Court of issue No. 1, as stated above. As to Monterey County Water Co., the parties have stipulated that at the time of its liquidation, in 1936, it had an operating deficit accumulated since March 1, 1913, in the amount of $47,030.64. As to Seventh and Hill Building Corporation, the parties have stipulated that at the time of its liquidation in 1938, it had an operating deficit accumulated since March 1, 1913, in the amount of $98,594.01.

From the stipulation and the briefs of the parties, it is assumed that when referring to "operating deficits" the parties mean the amounts by which the capital of the various corporations, as of the respective dates, stood impaired by reason of operating losses. Otherwise, the use of the term "operating deficit" might well leave some doubt as to the sufficiency of the facts for the purpose of determining the character of the distributions made by Spreckels Co. to the petitioners, in that in certain circumstances and as of a given period, a corporation might have an operating deficit which would in no way affect the character of the corporate distributions made to stockholders. See *Helvering* v. *Canfield*, 291 U. S. 163, affirming 24 B. T. A. 480.

Turning first to the question stated by the parties as issue No. 2, it is the contention of the petitioners that Oceanic and Kilauea could have no accumulated earnings or profits after February 28, 1913, to pass on to the Spreckels Co., until impaired capital as of that date had been restored, and, to the extent that allowance for restoration of such impaired capital was not made by the respondent in his determination, the distributions here in question were not taxable dividends within the meaning of section 115 of the statute. To the contrary, it is the claim of the respondent that by the provisions of section 115 of the code,[1] particularly those parts thereof which provide that the term "dividend" "means any distribution by a corporation to its shareholders * * * out of its earnings or profits accumulated after February 28, 1913," and that "any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed," Congress drew a line at March 1, 1913, not only as to earnings and profits accumulated or existing on that date, but likewise as to the existing state of the corporate capital on that date. On that interpretation of the statute, he argues that in computing corporate earnings accumulated after February 28, 1913, regard is to be given only to operating results after that date, and no regard is to be given to the condition or state of the corporate capital on that date.

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

(b) SOURCE OF DISTRIBUTIONS.—For the purpose of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. Any earnings or profits accumulated, or increase in value of property accrued, before March 1, 1913, may be distributed exempt from tax, after the earnings and profits accumulated after February 28, 1913, have been distributed, but any such tax-free distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113. * * *

Speaking generally, and aside from the income tax aspects of the problem, the argument of the respondent is plainly contrary to fundamental principles of corporation law. The capital of a corporation is the fund on which a corporation is to do business. It is the fund to be utilized by it in making the profits which may be distributed to its stockholders as dividends. It is the fund on which creditors and people doing business with the corporation are entitled to rely for assurance that it is an entity of financial responsibility, and, except for instances where, pursuant to statute or the provisions of its charter, a corporation is being liquidated or its capital reduced, distributions from capital are not normally to be made to stockholders, but rather the capital is to be preserved and maintained intact for the purposes for which it was paid in. In such circumstances, certain basic and fundamental principles of law have been evolved, to the end that dividends may "be declared only out of surplus profits,"[2] and further, "there can not be surplus or net profits for the purpose of declaring a dividend, unless the total value of the assets of the corporation at the time it is proposed to declare the dividend exceeds the amount of its capital stock, after deducting all expenses which have been incurred, and all losses which have been sustained. * * * In determining whether there are net profits from which dividends must be declared the capital must be regarded as a liability."[2] And where the capital of a corporation has been impaired or consumed through operations, it follows as a matter of fact and logic that even though subsequent operations result in profits, there can be no "surplus or net profits" in excess of the capital fund until the capital fund has been restored or made whole. And while under general corporation law it does appear that such restoration may, in some circumstances, be accomplished through appreciation in the value of assets, there is no such factor in this case.

Beginning with the Act of October 3, 1913, the first of the Federal income tax statutes enacted after ratification of the Sixteenth Amendment to the Constitution, dividends have, by specific statutory provision, always constituted gross income to an individual. That act contained no definition or limitation of the term "dividend." In the Revenue Act of 1916, however, the term "dividend" was limited to distributions made or ordered to be made by a corporation out of its earnings or profits accumulated after February 28, 1913. In the Revenue Act of 1917 provision was made that any distributions made to the shareholders of a corporation should be deemed to have been made from the most recently accumulated undivided profits or surplus and should constitute a part of the annual income of the distributee for the year in which received; provided, however, that the provision be not

---

[2] Secs. 5329 and 5335, vol. 11, Fletcher's Cyclopedia of the Law of Private Corporations.

construed as taxing earnings or profits accrued prior to March 1, 1913. Except for changes in phraseology, the statute remained in that form until the Revenue Act of 1936, when the provision limiting taxable dividends to distributions made by a corporation to its shareholders out of its earnings or profits accumulated after February 28, 1913, was amended to provide that taxable dividends should likewise include distributions "out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made." Such was the state of the statute during the taxable years here involved.

In due course, after the enactment of the Act of October 3, 1913, the Supreme Court had before it, in *Lynch* v. *Hornby*, 247 U. S. 339, the question whether, under the statute and the Constitution, distributions made by a corporation to its shareholders from a surplus of corporate assets existing at March 1, 1913, were as to the stockholders taxable income. In that case, the corporation, at March 1, 1913, had surplus assets of $3,000,000. In 1914 it made a distribution of $650,000 to its stockholders, of which $240,000 was from current earnings and the remaining $410,000 was from the conversion into money of property it had owned, or in which it had had an interest, on March 1, 1913. The question was whether that portion of the distribution representing the $410,000 was income to the stockholders. In resolving that question for the Government, the Court said:

* * * And we deem it equally clear that Congress was at liberty under the amendment to tax as income, without apportionment, everything that became income, in the ordinary sense of the word, after the adoption of the amendment, including dividends received in the ordinary course by a stockholder from a corporation, even though they were extraordinary in amount and might appear upon analysis to be a mere realization in possession of an inchoate and contingent interest that the stockholder had in a surplus of corporate assets previously existing. Dividends are the appropriate fruit of stock ownership, are commonly reckoned as income, and are expended as such by the stockholder without regard to whether they are declared from the most recent earnings, or from a surplus accumulated from the earnings of the past, or are based upon the increased value of the property of the corporation. The stockholder is, in the ordinary case, a different entity from the corporation, and Congress was at liberty to treat the dividends as coming to him *ab extra*, and as constituting a part of his income when they came to hand.

Hence we construe the provision of the act that "the net income of a taxable person shall include gains, profits, and income derived from * * * interest, rent, dividends, * * * or gains or profits and income derived from any source whatever" as including (for the purposes of the additional tax) all dividends declared and paid in the ordinary course of business by a corporation to its stockholders after the taking effect of the act (March 1, 1913), whether from current earnings, or from the accumulated surplus made up of past earnings

or increase in value of corporate assets, notwithstanding it accrued to the corporation in whole or in part prior to March 1, 1913. In short, the word "dividends" was employed in the act as descriptive of one kind of gain to the individual stockholder; dividends being treated as the tangible and recurrent returns upon his stock, analogous to the interest and rent received upon other forms of invested capital.

After concluding, as shown above, that the term "dividend" was to be given its usual and ordinary meaning, the Court took note of the fact that Congress, in the Revenue Act of 1916, had limited the term to mean distributions made by a corporation out of its earnings or profits accumulated since February 28, 1913, and indicated that it regarded the amendment merely as a concession to the equity of stockholders with respect to distributions from earnings accumulated at March 1, 1913, and as to which stockholders had no constitutional immunity, rather than as being otherwise declaratory of the meaning of the term "dividend." Certainly, as a general matter, a stockholder may not be regarded as having an equity in the impairment of corporate capital so as to be entitled to distributions from corporate earnings before capital has been restored.

As to the impairment of capital or paid-in surplus accruing after February 28, 1913, as a result of operating losses, the law is well settled, and the respondent concedes, that capital must be restored to the extent of such impairment out of earnings or profits before there can be any *accumulation* of earnings or profits after February 28, 1913, for distribution as a taxable dividend. *Foley Securities Corporation*, 38 B. T. A. 1036; affd., 106 Fed. (2d) 731; *Commissioner v. Farish & Co.*, 104 Fed. (2d) 833; *Hadden* v. *Commissioner*, 49 Fed. (2d) 709; *Roy J. Kinnear*, 36 B. T. A. 153; petition for review dismissed, 95 Fed. (2d) 997; *Loren D. Sale*, 35 B. T. A. 938; and *Arthur C. Stifel*, 29 B. T. A. 1145. Turning to the opinions in these cases, it seems to us plain and clear that the reasoning back of the conclusion that post-February 28, 1913, impairments of capital must be restored out of the earnings or profits before there can be any accumulation of earnings or profits from which taxable dividends can be paid, equally demonstrates and shows that there can be no *accumulation* of post-February 28, 1913, profits, for the purpose of distributing taxable dividends, until impaired capital at March 1, 1913, has been restored.

In *Commissioner* v. *Farish & Co.*, *supra*, the court said, "It is well settled that impairment of capital or paid in surplus of a corporation which resulted from operating losses must be restored before any earnings can be available for distribution to the stockholders. *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215." In *Milton Dairy Co.*, the Supreme Court, while dealing with the question of the existence of undivided profits for invested capital purposes, nevertheless, very plainly disclosed its views as to the existence not only of undivided

profits, but of surplus profits available for distribution as a dividend, wherein it said: "But it is a prerequisite to the existence of 'undivided profits' as well as a 'surplus' that the net assets of the corporation exceed the capital stock. Hence, where the capital is impaired, profits, though earned and remaining in the business, if insufficient to offset this impairment do not constitute 'undivided profits.' * * * We do not think Congress intended that a corporation whose capital was impaired should be entitled to treat profits that, though earned, were insufficient to make good the impairment and create a surplus, as 'undivided profits'."

In *Loren D. Sale, supra,* we had occasion to consider the question of impairment of capital occurring after February 28, 1913, and, in concluding that capital must be restored to the extent of such impairment before there can be any *accumulation* of earnings or profits available for distribution as a taxable dividend, we said:

There is a rule of law that every impairment of capital or paid-in surplus resulting from operating losses must be restored before any earnings can be available for the distribution of a taxable dividend within the meaning of section 201 (a) of the Revenue Act of 1924. *Crystal Ice Co.,* 14 B. T. A. 682; *J. L. Washburn,* 16 B. T. A. 1091; *Arthur C. Stifel,* 29 B. T. A. 1145; *Willcuts v. Milton Dairy Co.,* 275 U. S. 215. * * *

\* \* \* \* \* \* \*

The statute does not provide that impaired capital or paid-in surplus must be restored before earnings are available for the distribution of a taxable dividend. That rule of law was laid down by the Board and the courts, which had in mind the fundamental principle that a corporation, the capital of which had been impaired by losses, can never have any accumulated earnings until its capital is restored. Corporations, of course, were well known long before March 1, 1913, the effective date of the income tax. Likewise, the concepts of capital and impairment of capital were fixed in the law and generally understood. The provisions of the revenue acts have not changed the law in respect of capital or impairment of capital. Those acts, however, allowed for certain purposes the use of the fair market value on March 1, 1913, of property acquired prior thereto instead of the lower cost of such property. For example, in the computation of gain or loss giving rise to income or deductions, corporations could use March 1, 1913, value, regardless of what would have been the situation had they used cost as a basis. But in the determination of whether or not the capital of a particular corporation has been impaired, there is, so far as we know, no good reason or authority for using the fair market value on March 1, 1913. * * *

The respondent cites and relies upon *Hoffman* v. *United States* (Ct. Cls.), 53 Fed. (2d) 282. That case, in reality, however, was a case involving the computation of distributions made after February 28, 1913, from an increase in the value of property accruing before March 1, 1913. It is true that in the course of its opinion the Court of Claims cited, with apparent approval, its previous opinion in *Blair* v. *United States,* 63 Ct. Cls. 193, and the *Blair* case, on its face,

does seem to stand for the proposition that, under the Revenue Act of 1917, where a corporation had current earnings and made a distribution to its stockholders, such distributions constituted taxable dividends, within the meaning of the statute, without regard to whether or not there was an impairment of capital. The court did not seem to concern itself with the proposition whether there was impairment of capital before or after March 1, 1913, or both. In *J. L. Washburn*, 16 B. T. A. 1091, we had occasion to consider the *Blair* case, and, with all due respect to the Court of Claims, concluded that it did not represent sound law and declined to follow it. In *Foley Securities Corporation* v. *Commissioner*, *supra*, the Circuit Court of Appeals for the Eighth Circuit took note of our views as to the *Blair* case, and affirmed us in our conclusion, saying: "It seems to us obvious that the ruling of the Board and of the Commissioner as to what constitutes a 'dividend' under the definition of that term contained in Section 115 (a) must be accepted as correct. It follows that the distribution which was made by the taxpayer to its shareholders in 1934 was a 'dividend' only to the extent that it exceeded the operating deficit due to losses in prior years." In so holding, it is to be noted that the Circuit Court of Appeals accepted as authority in the matter the declaration of the Supreme Court in *Willcuts* v. *Milton Dairy Co.*, *supra*.

The case of *Chapman* v. *Anderson*, 11 Fed. Supp. 913, cited and relied on by the petitioners, seems to be directly in point. The respondent takes the position that the case is of no force here, in that the question involved was whether or not a book write-up in 1925 of the value of the corporate assets as of March 1, 1913, should be regarded as restoring capital which had been impaired by pre-March 1, 1913. operating deficits, so as to render taxable dividends paid by the corporation in 1925 and 1926. While it is true that that was the particular question and the court did conclude that the write-up of the assets on the books of the corporation as of March 1, 1913, did not restore the capital impaired, the ultimate question decided was that since the March 1, 1913, impairment of capital had not been restored out of subsequent earnings, distributions made from current profits were not taxable dividends to stockholders. In so holding, the court said that "unless an operating deficit or impairment of capital has been made good out of subsequent earnings or profits, any distribution of stock is not a 'dividend' under 26 U. S. C. A., section 932." The court there likewise looked to the Supreme Court's opinion in *Willcuts* v. *Milton Dairy Co.* for support, and also quoted from the opinion of the Court of Appeals for the Second Circuit in *Hadden* v. *Commissioner*, *supra*, as follows: "Congress did not intend that a corporation should be held to accumulate profits for one tax purpose

only and not for another. No earned surplus can be accumulated until the deficit or impairment of paid-in capital has been made good. Dividends paid while there is an operating deficit should be deemed to be from capital or paid-in surplus even though there are earnings of the taxable year sufficient to pay the dividend in whole or in part."

The reasoning of the various courts in reaching the conclusion that post-February 28, 1913, impairment of capital must be restored before there can be any accumulation of profits available for distribution to stockholders as dividends, seems to us equally applicable to impairment of capital whenever suffered or sustained, and the statutory provision providing that pre-March 1, 1913, earnings or profits may be distributed, tax-free, in no way affects the general rule stated and gives no basis for any conclusion that Congress, in recognizing, as the Supreme Court stated in *Lynch* v. *Hornby, supra,* the equity of stockholders as to pre-March 1, 1913, earnings, intended to legislate with respect to restoration or nonrestoration of capital which has been impaired by operating losses. This view, in our opinion, is further supported by the Supreme Court in its treatment of the problem involved in *Helvering* v. *Canfield, supra.* In that case, the corporation had accumulated earnings and profits at March 1, 1913. These earnings and profits were dissipated by subsequent operating losses. Thereafter the corporation had earnings and profits from which distributions were made to its stockholders, and the question was whether or not, under the statutory provision that distributions of pre-March 1, 1913, earnings or profits were tax-free, the post-February 28, 1913, earnings and profits must first be applied to absorb the loss of the pre-March 1, 1913, profits before there could be any accumulation of earnings or profits after February 28, 1913, for distribution as a taxable dividend. The Court answered the question in the negative, pointing out that the fact that pre-March 1, 1913, profits were lost through operations supplied no basis for permitting profits accumulated after that date to escape, and in stating its conclusion therein, the Court took pains to point out that it was not there "concerned with capital in the sense of fixed or paid-in capital, which is not to be impaired, or with the restoration of such capital where there has been impairment."

The respondent makes one further argument, which is that, since the enactment of the Revenue Act of 1936, taxable dividends include distributions out of earnings or profits of the current year, computed as of the close of the taxable year, irrespective of a deficit existing at the time the distribution was made, and contends that since section 115 (a) of the code makes no distinction between earnings or profits accumulated after February 28, 1913, and earnings or profits of the current year, as to taxability of distributions therefrom, there is no

valid basis for adopting a statutory interpretation that would require restoration of an impairment of capital existing on March 1, 1913, out of earnings or profits realized on or after that date. The provision referred to first appeared in the Revenue Bill of 1936, as reported to the Senate by the Senate Finance Committee, and was enacted into law in the language which appeared in the bill. Respecting this provision, the Senate Finance Committee Report, Rept. No. 2156, 74th Cong., 2d sess., p. 18, contains the following:

### Section 115 (a). Dividends Out of Current Earnings

In order to enable corporations without regard to deficits existing at the beginning of the taxable year to obtain the benefit of the dividends-paid credit for the purposes of the undistributed-profits surtax, section 115 (a) changes the definition of a dividend so as to include distributions out of the earnings or profits of the current taxable year. The amendment simplifies the determination by providing that distributions during the year, not exceeding in amount the current earnings, are dividends constituting taxable income to the shareholder and a dividends-paid credit to the corporation. As respects such dividends the complicated determination of accumulated earnings or profits is rendered unnecessary.

The language of the committee report indicates that as respects "earnings or profits *accumulated* after February 28, 1913" (emphasis ours), no change was intended in the law as it had been in prior acts, and that as to such distributions "regard to deficits existing at the beginning of the taxable year" and the "complicated determination of accumulated earnings or profits" would still be required. Only distributions from, and up to the amount of, the current earnings of the taxable year were intended to be freed of such requirements. The report, in recognizing the requirement for regard to deficits in the determination of earnings or profits accumulated after February 28, 1913, makes no distinction between deficits which arose prior to March 1, 1913, and those which arose afterwards. A further answer to the contention of the respondent is that we are not here concerned with distributions made by an impaired capital corporation out of current earnings for the taxable years.

From the above, we think it follows that there can be no accumulation of profits until impaired capital has been restored. There is a difference, we think, between the *realization* currently of earnings and profits and the *accumulation* thereof. In other words, there can be no accumulation of earnings where profits, as earned, are absorbed in restoration of capital which has been impaired through previous operating losses, and it seems to us fundamental that it matters not whether the impairment occurred before or after March 1, 1913. It is accordingly our conclusion that the petitioners must be sustained in their contention that, in computing the accumulated profits of Oceanic and Kilauea after February 28, 1913, allowance must be

made for the impairment of capital of those two corporations as of March 1, 1913.

In view of the conclusion above, it now becomes necessary to determine the issue stated by the parties as issue 1, which is whether the transfer by Oceanic on November 16, 1912, of 23,647 shares of its capital stock to J. D. Spreckels & Bros. Co. in consideration for the cancellation of notes of Oceanic, reduced the amount by which Oceanic's capital had been impaired by operating losses.

Oceanic was incorporated under the laws of California, on December 24, 1881, with an authorized capital of 25,000 shares of common stock of $100 par value per share. Payment of the subscription price of $100 per share for the original 25,000 shares of stock issued was made upon calls by the corporation over a period of twenty years. These calls were described in the books of account as "assessments." By the end of 1902, the original issue of stock was fully paid, $2,500,000 in cash having been received therefor. On April 29, 1903, an additional 25,000 shares of stock, of the par value of $100 per share were authorized, and were issued on April 30, 1903, to stockholders of record, pro rata. Upon the issuance of this stock, the capital stock account was credited with $2,500,000 and an account entitled "Stock Bonus Account" was debited in like amount, and at all times thereafter the capital stock account remained on Oceanic's books at $5,000,000. "At the date of this transaction the corporation had a deficit in excess of $1,500,000, of which approximately $750,000 resulted from operations of the business." Assessments were thereafter levied by the corporation on all shares of outstanding stock alike, whether of the original or second issue. After assessments were levied, like amounts were credited to the stock bonus account. Altogether there were six such assessments, the first at $2 per share and the others at $10 per share. In each of the first four levies some shares failed to pay the assessments thereon. All shares on which assessments were not paid, were "bid" in by the corporation for the amount of the unpaid assessments, and, in the case of the next assessment made, the assessments were made only on the shares left outstanding. The last of the six assessments was made on October 3, 1907. As a result of the assessments, a total of $1,393,654 was paid in, which, with the $2,500,000 paid in for the original 25,000 shares, made $3,893,654 as the total capital paid in to Oceanic for or on its stock. The number of shares left outstanding was 26,353, whereas 23,647 had been "bid" in by Oceanic for failure to pay assessments totaling $132,846. The 23,647 shares were not canceled, but were reissued in the name of Oceanic and were thereafter carried on its books as treasury stock, in the amount of $134,210.26, being the unpaid assessments of $132,846, plus $1,364.26

representing "charges in connection therewith." The exact nature of the charges is not shown.

Over the years, J. D. Spreckels & Bros. Co. advanced moneys for financing the activities of Oceanic. At November 16, 1912, that company held notes of Oceanic in the amount of $1,204,070.48, covering the advances and accrued interest. There was also accrued on that date interest on the notes in the amount of $79,623.91. According to the books of J. D. Spreckels & Bros. Co., $1,113,732.50 represented the amount of advances, whereas the balance of the face amount of the notes represented accrued interest on the advances. On November 16, 1912, Oceanic issued or transferred the 23,647 shares of its stock then carried on its books as treasury stock to J. D. Spreckels & Bros. Co. in consideration for the cancellation and surrender to it by J. D. Spreckels & Bros. Co. of the notes of Oceanic in the principal amount of $1,204,070.48, together with accrued interest in the amount of $79,623.91. On the same date a certificate for the said shares was issued to J. D. Spreckels & Bros. Co.

As a result of the above transactions, Oceanic made the following entries on its books of account: "On November 16, 1912 it charged 'Bills Payable' with the principal sum of said notes in the amount of $1,204,070.48 and charged 'Interest Accrued on Notes' with the accrued interest thereon in the amount of $79,623.91, the total of these two items in the amount of $1,283,694.39 being credited to an account entitled 'Deficiency'; and the Treasury Stock account was credited with the balance remaining in said account in the amount of $134,210.26 and this amount was charged to said 'Deficiency' account. On December 31, 1912 the balance of $973,500.00 remaining in the stock bonus account was written off and this amount was charged to said 'Deficiency' account."

From its incorporation in 1892, to September 26, 1912, the stock of J. D. Spreckels & Bros. Co. was entirely owned by J. D. and A. B. Spreckels, in equal amounts. On September 26, 1912, the said stock was transferred by the brothers, along with other property, to J. D. & A. B. Spreckels Securities Co. in exchange for all of its capital stock. J. D. & A. B. Spreckels Securities Co. was the predecessor of Spreckels Co. The parties have stipulated that the capital stock of Oceanic was worthless as of September 26, 1912.

The acquisition and disposition of the 23,647 shares of capital stock were the only transactions Oceanic ever had in its capital stock, other than the original issuance thereof.

On the facts, it is the contention of the respondent that Oceanic realized a gain of $1,149,484.13, or otherwise reduced its operating deficit by that amount, upon the transfer of the 23,647 shares of its

capital stock to Spreckels Co. The respondent arrives at that amount as follows:

| | |
|---|---:|
| Principal amount of notes canceled | $1, 204, 070. 48 |
| Accrued interest thereon | 79, 623. 91 |
| | 1, 283, 694. 39 |
| Less bid in price on delinquent stock sales | 134, 210. 26 |
| | $1, 149, 484. 13 |

The petitioners contend that the said transaction was a capital transaction, which did not result in any realization of gain or otherwise reduce the operating deficit of Oceanic.

The facts as to Oceanic disclose rather unorthodox capital financing. The original issue of 25,000 shares of $100 par value stock was subscribed for and in due course paid for in cash. Thereafter, and at a time when its capital was impaired, 25,000 additional shares of stock were authorized and issued to stockholders pro rata and book entries were made to show corporate capital at $5,000,000, even though no part of the additional $2,500,000, to offset the increase in the capital stock account, was paid in. Instead a "Stock Bonus Account" of $2,500,000 was set up, which, in the absence of other facts, might tend to indicate that the stockholders had subscribed for the added 25,000 shares of stock pro rata, at par, and that payment of the subscriptions would be made on calls by the corporation over a period of time, as was done in the case of the original 25,000 shares. The facts show, however, that such was not the case, but that thereafter assessments were levied, not on the new issue of 25,000 shares of stock, but on all shares equally, whether of the fully paid original shares or the new shares. Six levies were made in all, and in each of the first four levies some shares failed to meet the assessments and the shares were taken over, "bid" in or forfeited, until at the conclusion of the six levies there were actually outstanding only 26,353 shares of stock and there had been paid in for the original 25,000 shares and on assessments a total of $3,893,654.

The fact that the corporation saw fit to place the "bid" in shares on its books as treasury stock, at the amount of the unpaid assessments, plus a small amount of unexplained costs, for which the shares were forfeited or "bid" in, and further saw fit to continue these shares at par in its capital stock liability account, in no way changes the actual factual picture. Regardless of bookkeeping entries indulged in, the facts were that there had been paid in on capital stock a total of $3,-983,654 and there were outstanding only 26,353 shares of stock of a total par value of $2,635,300. In other words, the net result of the issue of the additional shares of stock, the levies and collection of the assessments, and the forfeiture or "bidding" in of the shares on which

the assessments were not paid, was that additional payments on stock totaling $1,393,654 were received, with a net increase in shares of stock actually outstanding of only 1,353 shares, having a total par value of only $135,300. It thus appears that, to the extent of the amounts which had been paid in on the forfeited shares, Oceanic had received substantial amounts as paid-in capital, but, as to the forfeited shares, it no longer had any capital stock liability, the over-all result being that the financial condition of both Oceanic and the holders of the 26,353 shares of outstanding capital stock had been substantially improved. In that situation, it might, with some force, be contended that the payments which had been made on the forfeited or "bid" in shares were, by such acquisition of shares, converted from capital to profits, thereby effecting a restoration of impaired capital or resulting in surplus profits available for distribution as dividends. The respondent, however, has advanced no such theory, and, furthermore, under the general law of corporations, amounts which have been paid on forfeited shares may not be regarded as surplus profits, subject to distribution as dividends, or applied in restoring impaired capital, even though when related to the reduction in capital stock still outstanding there may have seemed to have been a realization of profits by the corporation.[3] A statement of the general rule is found in section 5345, volume 11, Fletcher's Cyclopedia of the Law of Private Corporations, which reads, in part, as follows:

§ 5345. – *Property or money representing capital stock.* ·

Property or money which represents an investment of the capital stock of a corporation, or of any part thereof, cannot be regarded as surplus profits, and distributed as dividends, irrespective of the financial condition of the corporation. When a person subscribes for or purchases shares of stock in a corporation, and pays a part only of the amount due thereon, and the shares are afterwards forfeited for nonpayment of the balance, the amount paid is not profits, but a part of the capital, and cannot be divided among the stockholders. And the same is true of the proceeds of the sale by the corporation of shares of its own stock not previously issued, and of money paid into the treasury of the corporation by certain of its stockholders for the purpose of strengthening the company and adding to its working capital, and for which no additional stock is issued.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The stockholders of a corporation have the right to a division of its capital among them, after payment of its debts, when the corporation has been dissolved.

Nor is the rule questioned that a surplus arising from a lawful reduction of the capital stock is available for dividend purposes and may be lawfully distributed as such. The fund thus distributed is sometimes called a "dividend," but it is very different from a dividend out of profits.

---

[3] For cases where the question was whether a corporation realized taxable income upon forfeiture of shares for failure to pay the full amount of the subscriptions therefor, see *Realty Bond & Mortgage Co.* v. *United States* (Ct. Cls.), 16 Fed. Supp. 771; *Commissioner* v. *Inland Finance Co.*, 63 Fed. (2d) 886, affirming 23 B. T. A. 199; and *Illinois Rural Credit Association*, 3 B. T. A. 1178.

Whether or not the parties have based their alternate computations of the "operating deficit" of Oceanic on paid-in capital of $3,893,654 as of the date of issuance of the 23,647 shares to J. D. Spreckels & Bros. Co. on November 16, 1912, is not at once apparent. Inasmuch, however, as the issue as to the amount of the "operating deficit" at March 1, 1913, has been submitted by stipulation of the parties on the narrow proposition of whether the issuance of the 23,647 shares in consideration of the cancellation of Oceanic's notes and the accrued interest thereon resulted in gain to Oceanic, or otherwise reduced its "operating deficit," we have no occasion to look behind the stipulated results, however computed.

The 23,647 shares of stock were carried on the books of Oceanic as treasury stock. Treasury shares are presently defined in section 278 of the Civil Code of California as "shares issued and thereafter acquired by the corporation, but not retired or restored to the status of unissued shares." And while the authorities are not in complete agreement as to the procedure or method whereby a corporation may properly acquire and thereafter hold its shares as treasury stock, they do seem to agree that the holding of such shares is for use or disposition by the corporation "in furtherance of corporate purposes," or, differently stated, is for the purpose of subsequent sale to procure working capital. See sec. 5099, vol. 11, Fletcher's Cyclopedia of the Law of Private Corporations; *Borg* v. *International Silver Co.*, 11 Fed. (2d) 147; *Shores* v. *Dakota-Montana Oil Co.* (N. D.), 237 N. W. 172; *Maynard* v. *Doe Run Lead Co.* (Mo.), 265 S. W. 94; *State ex rel. Moore* v. *Manhattan Verde Co.* (Nev.), 109 Pac. 442. An apt analysis of the character and substance of treasury shares was given by Justice Learned Hand in his opinion in *Borg* v. *International Silver Co.*, *supra*, wherein he said: "To carry the shares as a liability, and as an asset at cost, is certainly a fiction, however admirable. They are not a liability, and on dissolution could not be so treated, because the obligor and obligee are one. They are not a present asset, because, as they stand, the defendant [the corporation] cannot collect upon them. What in fact they are is an opportunity to acquire new assets for the corporate treasury by creating new obligations. In order to indicate this potentiality, it may be the best accounting to carry them as an asset at cost, providing, of course, all other assets are so carried. * * * In any event there can be no ambiguity in stating the facts more directly * * *; that is, in treating the shares as not in existence while held in the treasury, except as a possible source of assets at some future time, when by sale at once they become liabilities and their proceeds assets. It makes no difference whether this satisfies ideal accounting or not."

That the issuance of the 23,647 shares to J. D. Spreckels & Bros. Co. on November 16, 1912, was in character a capital-producing transaction

and in no way resulted in the realization of gain or a restoration of Oceanic's impaired capital, is not, in our opinion, open to doubt. Looking to realities, the acquisition of these shares was not the purchase by Oceanic of an asset. While they are described as having been "bid" in for the amount of the unpaid assessments against them, and Oceanic carried them at a book cost equal to the amount of such unpaid assessments, plus a small amount of unexplained expenses, the effect of their acquisition was that of forfeiture for failure to pay the assessments or calls against them, made apparently in accordance with the terms of their original issue. In their reacquisition there was no outgo from either capital or profits, and the cost figures on Oceanic's books were accounting entries, nothing more. Certainly, on the facts here, these shares in the hands of Oceanic had no function or substance, and served no purpose, except for future sale or issue for the production of capital, with the attendant result that upon sale or issue they would likewise become an added capital stock liability. In order for the transaction to result in a realization of gain or otherwise reduce Oceanic's "operating deficit," as the respondent contends, it seems to us inescapable that Oceanic must come out of the transaction with either an increase in assets over what it had before and without an attendant increase in liabilities, or the assets which it did have must have been freed or released, to some extent, of the liabilities which enter into the computation of capital and surplus. Plainly no such results ensued. To put the transaction in its best light, from the standpoint of the respondent, it, at the most, resulted in change of a notes payable and accrued interest liability into a capital stock liability of equal or greater amount. In determining whether there are net profits from which dividends must be declared, the capital stock liability must be taken into account, just as would a notes payable liability. Sec. 5335, vol. 11, Fletcher's Cyclopedia of the Law of Private Corporations, *supra*. Such being the case, the change here could not possibly have resulted in gain or in the restoration of impaired capital. In reaching this conclusion, we do not overlook the cases wherein it has been decided that a corporation may, and in some instances has, realized taxable gain upon the acquisition and resale of its own shares. See and compare *M. Conley Co.*, 6 T. C. 250; *Rollins Burdick Hunter Co.*, 9 T. C. 169; *Cluett, Peabody & Co.*, 3 T. C. 169; *Dr. Pepper Bottling Co. of Mississippi*, 1 T. C. 8. Neither do we decide that a corporation may not traffic in its own shares in such manner that some part of the proceeds from a resale of such shares would properly go to profits, rather than to the enhancement of its capital fund. We do conclude, however, that such was not the result of the transaction here in question.

The last issue presents the question whether upon liquidation of Monterey County Water Co. and Seventh and Hill Building Corpora-

tion, wholly owned subsidiaries of Spreckels Co., deficits resulting in impairment of capital after February 28, 1913, were, under the rule in *Sansome* v. *Commissioner*, 60 Fed. (2d) 931, continued as a deficit to Spreckels Co. which would have to be restored out of Spreckels Co. profits in computing the earnings and profits of Spreckels Co. after February 28, 1913. The Monterey County Water Co. was dissolved on November 18, 1936, and on that date its capital was impaired by reason of operating losses after March 1, 1913, in the amount of $47,030.64. Seventh and Hill Building Corporation was dissolved on December 13, 1938, and when dissolved its capital was impaired by operating losses sustained after February 28, 1913, in the amount of $98,594.01. These liquidations were within the meaning of section 112 (b) (6) of the Revenue Acts of 1936 and 1938, respectively, which provides for the nonrecognition of gain or loss upon such transactions.

On authority of *Commissioner* v. *Phipps*, 336 U. S. 410, reversing 167 Fed. (2d) 117, we hold that the operating deficits of the above mentioned subsidiaries transferred upon their liquidation to the parent company do not serve to reduce the latter's accumulated earnings or profits available for distribution as taxable dividends in the years involved herein. Effect thereto, and also effect to the appropriate schedules contained in the stipulation, will be given in the recomputation under Rule 50.

The extent to which the distributions made by Spreckels Co. in 1938, 1939, and 1940 were paid out of its earnings or profits available for distribution as dividends will be determined pursuant to this opinion and the appropriate schedules contained in the stipulations, under Rule 50.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

TYSON, *J.*, concurring: I agree with the result reached in the majority opinion on the first and third issues. I also agree with the result reached on the second issue, that Oceanic's acquisition and subsequent disposition of shares of its own capital stock were a capital transaction which did not result in the realization of profits or otherwise reduce the then existing impairment of capital of Oceanic. However, I do not agree that the record establishes the existence of the basic fact upon which the opinion's rationale on this issue is predicated; that fact being that the shares of stock against which the assessments had been levied were acquired by Oceanic by forfeiture. That the rationale of the opinion is based on such a basic fact is clearly shown by a statement in the opinion made, after citation of authorities as to the effect of forfeiture of stock and some subsidiary questions. That statement is as follows:

* * * Looking to realities, the acquisition of these shares was not the purchase by Oceanic of an asset. While they are described as having been "bid" in for the amount of the unpaid assessments against them, and Oceanic carried them at a book cost equal to the amount of such unpaid assessments, plus a small amount of unexplained expenses, *the effect of their acquisition was that of forfeiture* [emphasis supplied] for failure to pay the assessments or calls against them, made apparently in accordance with the terms of their original issue. In their reacquisition there was no outgo from either capital or profits, and the cost figures on Oceanic's books were accounting entries, nothing more. * * *

If it were shown as a fact that the shares in question were acquired by Oceanic by forfeiture, as the majority opinion finds they were, I would not disagree with the rationale of that opinion on the second issue. However, not only is the fact that Oceanic acquired the shares by forfeiture not shown by the record, but also they are affirmatively shown to have been acquired by purchase and not by forfeiture, since the written stipulation of the parties on this point is as follows:

The shares of stock on which the assessments listed in the preceding schedule had not been paid were bid in by the corporation pursuant to *delinquency sale* [emphasis supplied] and thereafter carried on its books as treasury stock in the amount of $134,210.26. Said $134,210.26 represented the total of the unpaid assessments for which these shares were bid in together with charges in connection therewith. * * *

From the above quoted stipulation it clearly appears that the assessed shares were acquired by Oceanic by purchase for a consideration, and, this being so, I think that proper consideration of this issue can be had only on the established facts: (1) That there was a purchase of the assessed shares by Oceanic, and (2), of course, that there was a resale of them thereafter by Oceanic. When so considered, I think disposition of the issue should be in favor of the petitioners under authority of a long line of cases holding that, as a general rule of law, when a purchase and subsequent resale of its own stock are made by a corporation no gain or loss to the corporation is realized thereby. *Simmons & Hammond Manufacturing Co.*, 1 B. T. A. 803, a leading case; *Cooperative Furniture Co.*, 2 B. T. A. 165; *Atlantic Carton Corporation*, 2 B. T. A. 380; *Hutchins Lumber & Storage Co.*, 4 B. T. A. 705; *Farmers Deposit National Bank*, 5 B. T. A. 520; *H. S. Crocker Co.*, 5 B. T. A. 537; *Interurban Construction Co.*, 5 B. T. A. 529; *Liberty Agency Co.*, 5 B. T. A. 778; *Union Trust Co. of New Jersey*, 12 B. T. A. 688; and *105 West 55th Street, Inc.*, 15 B. T. A. 210.

There is no question that the transaction here involved is not one where "a corporation deals in its own shares as it might in the shares of another corporation" even if the principle set out in these words in the amendment of May 2, 1934, to the regulations applied to the transactions here involved, which took place many years before the date of the amendment, for the reasons that: Oceanic purchased its own shares at a delinquency sale necessitated by failure of some of its

stockholders to pay assessments levied on their stock; Oceanic held the purchased shares comprising almost one-half of its total authorized and issued stock as treasury stock for a period of six or seven years before its resale; when the resale was made Oceanic was insolvent and its shares were worthless; and no other purchases or sales of its own shares were ever made by Oceanic, except in the sale of its original issues.

Briefly stated, the error in the majority opinion on this issue is, I think, that it has applied a principle of law premised upon a basic fact, i. e., that Oceanic acquired the assessed stock by forfeiture—which fact is affirmatively shown not to have existed—whereas, I think a different principle of law should be applied and premised upon the real facts affirmatively shown to have existed, i. e., that Oceanic acquired the stock by purchase at the delinquency sale and thereafter sold the stock, thereby bringing the transactions within the general rule of law established by the above cited authorities, that a corporation realizes no gain from a purchase and resale of its own stock.

LEECH, *J.*, agrees with this concurring opinion.

———

DISNEY, *J.*, dissenting: I can not agree with the majority that in determining earnings or profits accumulated after February 28, 1913, pre-March 1, 1913, operating deficits impairing capital must be restored out of subsequent earnings or profits.

We are here concerned not with a corporation or its accounting methods, but with the taxation of a stockholder who has received distribution of corporate earnings which were actually earned since February 28, 1913. In my opinion, such stockholder is taxable thereon, under clear legislative mandate.

The majority opinion cites various cases which in nowise involve or decide the present question: *Foley Securities Corporation*, 38 B. T. A. 1036; affd., 106 Fed. (2d) 731, involved dividends paid credit of a personal holding company, and distinguishes the present situations by holding that there is no accumulation of earnings or profits until an operating loss is made good *"if incurred after March 1, 1913."* (Italics supplied.) The corporation therein was organized in 1928, so our question could not there occur. The same is true of *Arthur C. Stifel*, 29 B. T. A. 1145, and *Commissioner* v. *Farish & Co.*, 104 Fed. (2d) 833. In *Roy J. Kinnear*, 36 B. T. A. 153, there was on March 1, 1913, a paid-in surplus of about $2,500,000, and the question was the effect of later operating losses. *Loren D. Sale*, 35 B. T. A. 938, involved a stipulation of operating loss for the period after March 1, 1913, computed on March 1, 1913, values, and it was held that such stipulation does not show that capital or paid-in surplus was ever impaired. So the

present question as to restoration of lost capital out of subsequent earnings was not at issue. In *Crystal Ice Co.*, 14 B. T. A. 682, relied on by the *Sale* case, *supra*, though the corporation was organized in 1912, there was from organization up to December 31, 1914, an earned surplus of about $23,000 and the deficits involved were incurred later. In *J. L. Washburn*, 16 B. T. A. 1091, also cited in the *Sale* case, it appears that the deficit involved was incurred in 1923. Obviously, such cases do not reach our difficulty here, and I find no help in them. *Hadden* v. *Commissioner*, 49 Fed. (2d) 709, also so cited, is indeed to the contrary, for examination thereof reveals that the corporation had, as in this case, an operating deficit, up to March 1, 1913, of about $500,-000, and from that date to April 30, 1917, an operating loss of $329,-549.22. Yet in computing corporate earnings and profits on the question of taxability of dividends the court subtracted, from later earnings, only the $329,549.22 and not the $500,000. That this was intended is shown in the following language:

* * * Operating losses sustained *after March 1, 1913*, must be deducted from profits realized after that date before they can be a taxable profit * * *. [Italics supplied.]

The court says this, and, as above seen, does not deduct pre-March 1, 1913, operating loss, though in the previous sentence it had broadly said: "Dividends paid while there is an operating deficit should be deemed to be from capital or paid-in surplus * * *." This generality, shown so to be by the court's next language, above quoted, and its action, appears to be the *ratio decidendi* of the majority here, i. e., that as a general proposition dividends paid in the face of an operating deficit should be regarded as from capital or paid-in surplus. With this broad concept I do not disagree. But we here have a question of the effect for income tax purposes of the date March 1, 1913, and what Congress intended. Neither the general concept, nor cases involving only post-March 1, 1913, deficits afford us light. Indeed, such cases, above distinguished, seem inherently based upon the idea that, within the intendment of "earnings or profits accumulated after February 28, 1913," there was no accumulation, because no net accumulation, due to deficits within that period. This is shown in the references to the definition of dividend in section 115 in such cases as *Foley Securities Corporation, Roy J. Kinnear*, and *Loren D. Sale, supra*.

Since the money here involved as distributed to stockholders was in fact earned by the corporation since February 28, 1913, it is to be presumed that Congress, intending to use its taxing power to the fullest extent, intended to tax such funds. *Irwin* v. *Gavit*, 268 U. S. 161; *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84. In *Frank D. Darrow*, 8 B. T. A. 276, we said:

Though Congress exempted from taxation as dividends or otherwise, distributions of earnings accumulated prior to March 1, 1913, at the same time it so defined taxable dividends as to include *every* distribution of earnings accumulated since February 28, 1913, in whatever form the distribution might be made. The intention of Congress to tax as dividends, distributions, however made, of earnings since February 28, 1913, is evident from the broad and comprehensive language of the definition and the specific inclusion of stock dividends to the extent of such earnings. * * *

*Eisner* v. *Macomber*, 252 U. S. 189, held stock dividends nontaxable. After March 1, 1913, "dividends declared and paid * * * whether out of current earnings or profits accumulated prior to that date [not here involved] constituted income to the stockholders and not capital and were taxable as income if the Congress saw fit to impose the tax." *Helvering* v. *Canfield*, 291 U. S. 163. Did Congress so intend? The petitioner here is seeking immunity from tax, that is, is seeking an exemption, a matter of legislative grace. She has, therefore, the burden of showing a clear and unambiguous statutory right to such exemption from tax. *Wright* v. *Georgia R. R. & Banking Co.*, 216 U. S. 420; *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435; *White* v. *United States*, 305 U. S. 281. Exemptions can not rest on implication, doubt, or ambiguity; *United States* v. *Stewart*, 311 U. S. 60; or inference, *Pacific Co., Ltd.* v. *Johnson*, 285 U. S. 480.

The majority view here is seen as resting on nothing else. The most that appears to be relied on is possible ambiguity in the word "accumulation," in section 115 of the Internal Revenue Code. Section 115, defining dividends, not only fails to provide for exemption from taxation of dividends to the extent there were pre-March 1, 1913, operating or capital deficits, but affirmatively defines dividend as being, *inter alia*, a distribution out of "earnings or profits accumulated after February 28, 1913"; and, what is even more significant, in providing exemption from tax, as to the period before March 1, 1913, carefully limited itself to providing that "any earnings or profits accumulated, or increase in value of property accrued before March 1, 1913, may be distributed exempt from tax * * * ." "*Inclusio unius est exclusio alterius*" never applied more clearly. The exemption desired by the petitioner is excluded. The statute, instead of showing the clear right to exemption which petitioner must show, to the contrary clearly negatives such right. It is to be noted also, in the language last quoted, the recognition of "earnings or profits accumulated * * * before March 1, 1913"—a plainly intended contrast to "earnings or profits accumulated after February 28, 1913," in the preceding subsection, 115 (a). Yet the majority view, in so far as it is able to rely on section 115 at all, is that (because of general ideas of corporate profit existing only after repairment of capital and because the

cited cases above mentioned hold that post-February 28, 1913, operating losses may be recouped out of earnings and profits before accumulation of profits to pay taxable dividends) "there can be no accumulation of post-February 28, 1913, profits for the purpose of distributing taxable dividends, until impaired capital at March 1, 1913, has been restored." But this only amounts to the argument that on this tax question, before taxable dividends can be paid, there must be net profits from the inception of the corporation, and that, though Congress defined a dividend as from accumulations *after* February 28, 1913, and used "accumulated" to refer to two distinct periods, before and after that date, yet the word must be held to refer to and encompass the whole corporate life so that, for present tax purposes, there is no accumulation of earnings and profits because of capital impairment in the earlier period. But the statute does not say "profit" or "net profit" or "net profit [or net accumulations] over corporate life," but only "earnings or profits accumulated after February 28, 1913." The text of the *Canfield* case indicates that the petitioner there made the same argument as here, for the Court says: "The argument for the stockholders stresses the word 'accumulated.' We think that the expression is made to carry too heavy a burden."

In my opinion, the language of section 115 obviously and affirmatively refutes the majority view. It subjects *all* of the net accumulations of earnings or profits after February 28, 1913, to taxable distribution. Under the *Canfield* case, where deficits apply against March 1, 1913, surplus, later lost, and not against later earnings, we see even more than the post-March 1, 1913, net so subjected to tax. It does not carve out or except any amount equivalent to operating deficits or capital losses prior to that date. The only provision of that nature, or as to the earlier period, is as to tax-free distribution of earnings or profits as to the time before February 28, 1913. In addition to the above reasons for so believing, I note that section 115 (b) also states that "for the purposes of this chapter every distribution is made * * * from the most recently accumulated earnings or profits"; further, that earnings or profits accumulated before March 1, 1913, may be distributed only *after* distribution of those accumulated after that date. It is clear that Congress had a concept of "accumulation" as being in three chronological categories, completely contrary to the majority's idea of considering the corporate life, even prior to March 1, 1913, as one continuous period of accumulation. It seems to me impossible to read section 115 (a) and to conclude that "accumulated after February 28, 1913," means accumulated both before and after that time, when the word is used as to three distinct periods. Accumulation may be recent, may be

back to February 28, 1913, and may be before that date. And, as far as the phrase "earnings or profits" is concerned, a corporation has profits, taxable profit, despite earlier deficits. *Long Beach Improvement Co.*, 5 B. T. A. 590. There it was held that, although net income of a corporation for 1920 was insufficient to wipe out a preexisting deficit ("for several years prior to 1919"), nevertheless, such income was taxable to the corporation. This can only mean that the corporation actually had "earnings or profits" for 1920 despite its previous deficit. How then can it be said that such corporation did not have "earnings or profits" within the definition of dividend in section 115? In the *Long Beach* case the Court disagreed with the petitioner's contention that net income was something different when applied to a corporation from "gain, net gain, profit, net profit." Thus we see that that corporation had net profit for 1920 despite earlier capital deficits. It would in that respect be immaterial whether those deficits were before or after March 1, 1913. In *Cranson* v. *United States*, 146 Fed. (2d) 871, *Long Beach Improvement Co.*, *supra*, was cited and approved. It is relied on for the above conclusion in *Foley Securities Corporation, supra* (one of the cases relied on by the majority here), where we said:

\* \* \* There is no doubt that the term "income" as used in the Sixteenth Amendment is broad enough to cover current corporate income even though a deficit may exist. Congress can and does impose a tax on such income. \* \* \*

In my view, not only is there within section 115 *accumulation*, but accumulation of "earnings or profits" after February 28, 1913, though there is capital impairment prior to that date.

In *Helvering* v. *Canfield, supra*, the Court had, as it said, no case of impairment of capital, but it also said, "We are dealing with a distribution of accumulated profits." This referred to profits accumulated from 1917 to 1923. The Court continued:

\* \* \* When a corporation continued in business after March 1, 1913, the dividends it later declared and paid to its stockholders, whether out of current earnings or from profits accumulated prior to that date, constituted income to the stockholders, and not capital, and were taxable as income if the Congress saw fit to impose the tax. *Lynch* v. *Hornby*, 247 U. S. 339. \* \* \*

I suggest that Congress has clearly, in section 115, seen fit to impose the tax, and that the majority has not demonstrated otherwise.

In the *Canfield* case the Court had the question of whether earnings or profits actually earned in 1917–1923 should be distributed tax-free, because of a theory that they should go to replace earlier losses of surplus which had existed on March 1, 1913. The Court held that the surplus, embarked in the business after March 1, 1913, had actually been lost and, referring to the contention that later distributions should replace the loss, as "immunity is sought from the taxation of

an equivalent amount of profit subsequently earned," denied the immunity. The following language from the Court is highly pertinent here:

Paragraphs (a) and (b) of section 201 disclose a single purpose, and are to be construed in harmony with each other. They show that the Congress was careful to arrange its plan so that the right to receive, free of tax, a distribution of surplus accumulated prior to March 1, 1913, should not be exercised in such a fashion as to permit profits accumulated after that date to escape taxation. To that end the Congress provided that "every distribution is made out of earnings or profits, and from the most recently accumulated earnings or profits, to the extent of such earnings or profits accumulated since February 28, 1913." Then follows *the exemption which is strictly limited to a distribution of profits accumulated prior to March 1, 1913.* Nothing is said as to a restoration of those profits out of subsequent earnings if the former have been lost. [Italics supplied.]

I emphasize that the Court not only refers to the matter as an exemption, but also that it says that it is *strictly limited* to distribution of pre-March 1, 1913, profits. Nothing is said in section 115 (a) as to restoration of lost profits or about subsequent earnings, *or as to restoration of lost pre-March 1, 1913, capital* therefrom. Again the Court: "But the actual course of events is not to be ignored." It seems clear that the case stands for the proposition that corporate profits actually accumulated after March 1, 1913, were by Congress subjected to tax. Just as the right to receive, free of tax, surplus accumulated before March 1, 1913, "should not be exercised in such fashion as to permit profits accumulated after that date to escape taxation," so, in my view, the general concept of capital repairment should not be so strained (here as to a period prior to February 28, 1913) as to overthrow the text and intendment of section 115, and cause exemption from tax. Exemption from tax "strictly limited" can not encompass such an end. I can not conceive why, if loss of surplus accumulated on March 1, 1913, is not in the *Canfield* case permitted to work such an effect, a still earlier loss of capital, prior to March 1, 1913, should be accorded a different result, and profits admittedly earned since the inception of income tax be freed from tax.

In *Hoffman* v. *United States*, 53 Fed. (2d) 282, the corporation had a pre-March 1, 1913, operating loss of about $211,000, and a profit of $132,000 from March 1, 1913, to December 31, 1913. In the course of the opinion the court says:

* * * If the profit of 1913 had been distributed in that year, we think it would have been taxable, notwithstanding there was an operating deficit prior to March 1 of that year. * * *

The corporation's assets had increased in value, prior to March 1, 1913, and the opinion holds that such increase was distributable free of tax in 1917, but nowhere do I find the taxable amount, of a dividend

paid in 1917, affected by the $211,000 pre-March 1, 1913, operating loss, though other distributions and profits and losses after 1913 had to be considered in fixing the amount.

The majority finds *Chapman* v. *Anderson*, 11 Fed. Supp. 913, in point. The petitioner on brief called this "the only case in which this case has been squarely decided." Yet there the court was concerned only with whether an entry on corporate books writing up assets by $274,838.97 to reflect value on March 1, 1913, was earnings or profits applicable to reduce an operating deficit of that date so as to affect taxability of distribution on stock in 1925–1926—and the Court held it was not. The present question seems not to have been presented. "The only point at issue is the interpretation to be given to the write-up of the sum of $274,838.97." The court did no more than assume, without analysis of the problem, that pre-March 1, 1913, operating deficits must be restored, the same as post-March 1, 1913, deficits.

In *Frank D. Darrow*, *supra*, we held that because there was in the Revenue Act of 1921 no provision excluding liquidating distributions from earnings or profits since February 28, 1913, from general statutory definition of dividend, they were above capital to be taxed as dividends. We said:

Again we find clearly expressed the intention of Congress to tax as a dividend *every* distribution of earnings accumulated since February 28, 1913, in whatever form or manner made, and in the absence of a contrary intent appearing from the Act, a liquidating distribution of such earnings would be taxable as other dividends. * * *

The *Darrow* case is cited and approved in *McCaughn* v. *McCahan*, 39 Fed. (2d) 3, and various other cases to the same effect.

Thus it is seen that a definite statutory provision (such as has been in the revenue acts since 1924, as to liquidating distributions) is necessary to exclude any dividend from the broad sweep of Congressional intent and the language found in section 115 (a). The majority points to no statute, except to the extent that it interprets "accumulated" in section 115 (a), but relies on general ideas not related to the revenue acts since 1913.

Again, I note that the regulations, e. g., Regulations 94, section 115, have long set forth the requirements of a dividend, and among other statements we find that a distribution of earnings or profits accumulated prior to March 1, 1913, is not a dividend; also that, in determining source of a distribution, earnings or profits accumulated prior to March 1, 1913, are to be considered *only* "after all the earnings or profits of the taxable year and all the earnings or profits accumulated since February 28, 1913, have been distributed." Again: "A loss sustained for a year prior to the taxable year does not affect the earnings or profits of the taxable year" (with discussion of exceptions not here pertinent. No

exception is made as to pre-March 1, 1913, capital impairment). These provisions of the regulations seem to me to show that dividends are there construed as not to require consideration of capital losses in the pre-March 1, 1913, period. The idea approved by the majority is not set forth in the regulations, just as it is found lacking in the statute. The repeated reenactment of the statute so construed by the regulations gives to them the effect of law, and precludes the interpretation given by the majority. *Helvering* v. *Reynolds Tobacco Co.*, 306 U. S. 110. Congress, in my view, did not contemplate immunity from taxability of earnings after March 1, 1913, by deduction of capital invested, but already lost by that date. The capital as it stood at that date appears to me properly the source of later income. Income is "fruit born of capital." *United States* v. *Safety Car Heating & Lighting Co.*, 297 U. S. 88. The part earlier lost was not risked in the business after February 28, 1913, as was the March 1, 1913, surplus in the *Canfield* case.

Under section 113 (a) (14) the stockholder may take either cost or March 1, 1913, fair market value, whichever is greater, as his basis for determining gain, and the section provides that in determining such value due regard shall be given to value of the corporate assets. The stockholder can be taxed with gain only above his pre-March 1, 1913, cost, and not above value on that date, if less than cost. *Goodrich* v. *Edwards*, 255 U. S. 527. He is, therefore, both by the statute and the constitutional principle as laid down in the *Goodrich* case, protected against pre-March 1, 1913, depreciation in value in his stock, in the computation of profit or loss, upon sale. I, therefore, discern no reason for allowing him nontaxability, with the attendant adjustment downward of his base, when he receives a dividend, sufficient to override the plain statutory definition of dividend as distribution of post-February 28, 1913, profits. He is, in effect, not affected, in the end, by the pre-February 28, 1913, operating deficit affecting value of his stock, since he may take cost, at an earlier date, as basis, and the majority view would merely accelerate recovery of a part of his basis, deferring tax until disposition of the stock. Ground therefor, contrary to the text of section 115, does not appear. March 1, 1913, has a definite meaning for income tax purposes, and general ideas of corporate accounting are subject thereto and to the language of section 115. I am not assisted, on this question, by *Willcuts* v. *Milton Dairy Co.*, 275 U. S. 215, as to invested capital and excess profits. It states specifically that *Long Beach Improvement Co.*, *supra*, "is not of moment. The deductions from gross income allowed by that Title [Title 2 of the Revenue Act of 1918, as to income tax] do not refer to invested capital, surplus or undivided profits, and its provisions throw no light upon the meaning of those terms as used in Title 3 providing for an excess profits tax."

*Lynch* v. *Hornby*, 247 U. S. 339, though based on the Act of 1913, and with no reference to the particular question here, is opposed to the majority view, though therein cited; for it stands for the principle that, under the broad definition of income, Congress was at liberty to tax all dividends declared and paid in the ordinary course "after taking effect of the act (March 1, 1913)," even though derived from pre-March 1, 1913, earnings, unless, as later in the Income Tax Acts of 1916 and 1917, Congress saw fit specifically to except such pre-March 1, 1913, earnings from taxation. So here, without a statute of similar import, it is submitted that operating deficits prior to the effective date of the first income tax act have not been given tax-immunizing effect, in the face of the broad definition of dividend in section 115 (a) and the Congressional intent to use its full taxing power. To point up my view, above expressed, that "accumulation" is separately applied to the post-February 28, 1913, period, *Lynch* v. *Hornby* itself does so; for, discussing undivided profits before declaration of a dividend, it is said:

This treatment of undivided profits applies only to profits permitted to accumulate *after* the taking effect of the act, since only with respect to these is a fraudulent purpose of evading the tax predicable. Corporate profits that accumulated *before* the act took effect *stand on a different footing.* * * * [Emphasis supplied.]

I would not diminish earnings or profits in fact accumulated since February 28, 1913, by capital deficits prior thereto, and, therefore, I respectfully dissent.

ARNOLD and OPPER, *JJ.*, agree with this dissent.